## SAFFLE, WARDEN, ET AL. *v.* PARKS

No. 88–1264.   Argued November 1, 1989—Decided March 5, 1990

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, and in all but Part IV of which BLACKMUN and STEVENS, JJ., joined, *post*, p. 495.

*Robert A. Nance*, Assistant Attorney General of Oklahoma, argued the cause for petitioner. With him on the briefs was *Robert H. Henry*, Attorney General.

*Vivian Berger*, by appointment of the Court, 490 U. S. 1063, argued the cause and filed a brief for respondent.*

JUSTICE KENNEDY delivered the opinion of the Court.

The issue before us is whether respondent Robyn Leroy Parks, whose conviction and death sentence became final in

---

*\*John K. Van de Kamp*, Attorney General, *Richard B. Iglehart*, Chief Assistant Attorney General, *Harley D. Mayfield*, Senior Assistant Attorney General, and *Jay M. Bloom*, Deputy Attorney General, filed a brief for the State of California as *amicus curiae*.

1983, is entitled to federal habeas relief. His claim is that an instruction in the penalty phase of his trial, telling the jury to avoid any influence of sympathy, violates the Eighth Amendment. In *Penry* v. *Lynaugh*, 492 U. S. 302 (1989), we held that a new rule of constitutional law will not be applied in cases on collateral review unless the rule comes within one of two narrow exceptions. This limitation on the proper exercise of habeas corpus jurisdiction applies to capital and noncapital cases. See *id.*, at 314. We hold that Parks is not entitled to federal habeas relief. The principle he urges is a new rule within the meaning of *Teague* v. *Lane*, 489 U. S. 288 (1989). It is not dictated by our prior cases and, were it to be adopted, it would contravene well-considered precedents. We also hold that the rule petitioner asks us to adopt does not come within either of the two exceptions set forth in *Teague*.

A passing motorist found Abdullah Ibrahim, a native of Bangladesh, dead inside the Oklahoma City gas station where Ibrahim worked. The victim died from a single chest wound inflicted by a .45-caliber pistol. Parks admitted the murder to a friend, and the police obtained tapes of that statement. Parks said that he shot Ibrahim because he was afraid Ibrahim would tell the police that Parks used a stolen credit card to purchase gasoline.

In 1978, a jury found Parks guilty of capital murder. During the sentencing phase of the trial, Parks offered as mitigating evidence the testimony of his father, who described Parks' background and character. Parks' counsel relied upon this testimony in his closing argument, arguing that Parks' youth, race, school experiences, and broken home were mitigating factors that the jury should consider in making its sentencing decision. He asked the jury to show "kindness" to Parks in consideration of his background.

After instructing the jury that it must consider all of the mitigating circumstances, statutory or nonstatutory, proffered by Parks, and that it could consider any mitigating cir-

cumstances that it found from the evidence, the trial court delivered the following instruction:

> "You are the judges of the facts. The importance and worth of the evidence is for you to determine. You must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence. You should discharge your duties as jurors impartially, conscientiously and faithfully under your oaths and return such verdict as the evidence warrants when measured by these Instructions." App. 13.

After finding as an aggravating circumstance that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution," Okla. Stat., Tit. 21, § 701.12 (1981), the jury sentenced Parks to death.

Parks' conviction and sentence were affirmed on direct appeal by the Oklahoma Court of Criminal Appeals, *Parks* v. *State*, 651 P. 2d 686 (1982), and we denied certiorari, 459 U. S. 1155 (1983). After seeking postconviction relief in the state courts, Parks filed a petition for a writ of habeas corpus in Federal District Court arguing, *inter alia*, that the antisympathy instruction delivered in the penalty phase violated the Eighth Amendment because it in effect told the jury to disregard the mitigating evidence that Parks had presented. The District Court denied relief, and a divided panel of the Court of Appeals for the Tenth Circuit affirmed. *Parks* v. *Brown*, 840 F. 2d 1496 (1988). On rehearing, the Tenth Circuit sitting en banc reversed, holding that the antisympathy instruction was unconstitutional for the reasons advanced by Parks. *Parks* v. *Brown*, 860 F. 2d 1545 (1988). We granted certiorari, 490 U. S. 1034 (1989), and now reverse.

Parks petitions the federal courts for a writ of habeas corpus. As he is before us on collateral review, we must first determine whether the relief sought would create a new rule under our holdings in *Teague* v. *Lane, supra,* at 299–301, and *Penry, supra,* at 313. If so, we will neither announce nor apply the new rule sought by Parks unless it would fall

into one of two narrow exceptions. *Teague, supra,* at 307; *Penry, supra,* at 329.

In *Teague,* we defined a new rule as a rule that "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "*dictated* by precedent existing at the time the defendant's conviction became final." *Teague, supra,* at 301 (plurality opinion) (emphasis in original). The explicit overruling of an earlier holding no doubt creates a new rule; it is more difficult, however, to determine whether we announce a new rule when a decision extends the reasoning of our prior cases. As we recognized in *Butler* v. *McKellar, ante,* at 412–414, the question must be answered by reference to the underlying purposes of the habeas writ. Foremost among these is ensuring that state courts conduct criminal proceedings in accordance with the Constitution as interpreted at the time of the proceedings. See *ante,* at 413. " '[T]he threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards. In order to perform this deterrence function, . . . the habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place.' " *Teague, supra,* at 306 (quoting *Desist* v. *United States,* 394 U. S. 244, 262–263 (1969) (Harlan, J., dissenting)). See also *Solem* v. *Stumes,* 465 U. S. 638, 653 (1984) (Powell, J., concurring in judgment). "The 'new rule' principle therefore validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler, ante,* at 414. Under this functional view of what constitutes a new rule, our task is to determine whether a state court considering Parks' claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule Parks seeks was required by the Constitution.

Parks contends that the result he seeks does not involve the creation of a new rule. Relying upon our decisions in

*Lockett* v. *Ohio*, 438 U. S. 586 (1978), and *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), both decided before his conviction became final in 1983, and our decision in *California* v. *Brown*, 479 U. S. 538 (1987), decided after his conviction became final, Parks argues that the Eighth Amendment, as interpreted in 1983, required, and still requires, that jurors be allowed to base the sentencing decision upon the sympathy they feel for the defendant after hearing his mitigating evidence. We disagree and conclude that adoption of this principle would create a new rule as defined in *Teague* and *Penry*.

In *Lockett*, a plurality of the Court decided that an Ohio death penalty statute that limited the jury's consideration to specified mitigating circumstances violated the constitutional requirement of individualized sentencing in capital cases. See 438 U. S., at 605. The plurality based its conclusion on the view that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.*, at 604 (emphasis in original; footnotes omitted).

In *Eddings*, the view adopted by the *Lockett* plurality ripened into a holding of the Court. We ruled that a sentencing judge's refusal, as a matter of law, to consider mitigating evidence presented by a capital defendant concerning his family history and upbringing was constitutional error. Relying on the plurality opinion in *Lockett*, the Court reasoned:

> "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer . . . may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from

their consideration." *Eddings, supra,* at 113–115 (emphasis in original).

Review of our decisions in *Lockett* and *Eddings* convinces us that the two cases do not dictate the result urged by Parks. There is no dispute as to the precise holding in each of the two cases: that the State cannot bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial. These two cases place clear limits on the ability of the State to define the factual bases upon which the capital sentencing decision must be made. Indeed, that is how we have interpreted these decisions in later cases. See *Hitchcock* v. *Dugger,* 481 U. S. 393, 398–399 (1987) (instruction to advisory jury not to consider nonstatutory mitigating circumstances, and refusal by sentencing judge to consider the same); *Skipper* v. *South Carolina,* 476 U. S. 1, 4–5 (1986) (exclusion of evidence regarding defendant's postoffense conduct).

*Lockett* and *Eddings* do not speak directly, if at all, to the issue presented here: whether the State may instruct the sentencer to render its decision on the evidence without sympathy. Parks asks us to create a rule relating, not to *what* mitigating evidence the jury must be permitted to consider in making its sentencing decision, but to *how* it must consider the mitigating evidence. There is a simple and logical difference between rules that govern what factors the jury must be permitted to consider in making its sentencing decision and rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision. We thus cannot say that the large majority of federal and state courts that have rejected challenges to antisympathy instructions similar to that given at Parks' trial have been unreasonable in concluding that the instructions do not violate the rule of *Lockett* and *Eddings.* See *Byrne* v. *Butler,* 847 F. 2d 1135, 1138–1140 (CA5 1988); *People* v. *Emerson,* 122 Ill. 2d 411, 442–443, 522 N. E. 2d 1109, 1122 (1987), cert. denied, 488 U. S. 900 (1988); *State* v. *Ramseur,* 106 N. J. 123, 295–

299, 524 A. 2d 188, 275–277 (1987); *State* v. *Steffen*, 31 Ohio St. 3d 111, 125, 509 N. E. 2d 383, 396 (1987), cert. denied, 485 U. S. 916 (1988); *State* v. *Owens*, 293 S. C. 161, 169, 359 S. E. 2d 275, 279, cert. denied, 484 U. S. 982 (1987); *State* v. *Porterfield*, 746 S. W. 2d 441, 450–451 (Tenn.), cert. denied, 486 U. S. 1017 (1988). Even were we to agree with Parks' assertion that our decisions in *Lockett* and *Eddings* inform, or even control or govern, the analysis of his claim, it does not follow that they compel the rule that Parks seeks. See *Butler, ante,* at 414–415.

Parks contends that our decision in *Penry* that the relief sought there did not call for the creation of a new rule compels a similar result in this case. We disagree. In *Penry,* we held that resolution of a claim that the Texas death penalty scheme prevented the jury from considering and giving effect to certain types of mitigating evidence did not involve the creation of a new rule under *Teague.* See *Penry,* 492 U. S., at 315. To the extent that Penry's claim was that the Texas system prevented the jury from giving any mitigating effect to the evidence of his mental retardation and abuse in childhood, the decision that the claim did not require the creation of a new rule is not surprising. *Lockett* and *Eddings* command that the State must allow the jury to give effect to mitigating evidence in making the sentencing decision; Penry's contention was that Texas barred the jury from so acting. Here, by contrast, there is no contention that the State altogether prevented Parks' jury from considering, weighing, and giving effect to all of the mitigating evidence that Parks put before them; rather, Parks' contention is that the State has unconstitutionally limited the manner in which his mitigating evidence may be considered. As we have concluded above, the former contention would come under the rule of *Lockett* and *Eddings;* the latter does not.

Penry's claim, moreover, did not ask us to apply the reasoning of *Lockett* and *Eddings* so much as it required us to apply our decision in *Jurek* v. *Texas,* 428 U. S. 262 (1976).

*Penry* interpreted *Jurek* as holding that the Texas death penalty statute is constitutional so long as it is interpreted by the Texas courts to permit the jury to consider mitigating circumstances proffered by the defendant. See *Penry, supra,* at 316. Having thus construed *Jurek,* we concluded that resolution of Penry's claim that "those assurances were not fulfilled *in his particular case,*" 492 U. S., at 318 (emphasis in original), did not involve the creation of a new rule:

> "In our view, the relief Penry seeks does not 'impos[e] a new obligation' on the State of Texas. Rather, Penry simply asks the State to fulfill the assurance upon which *Jurek* was based: namely, that the special issues would be interpreted broadly enough to permit the sentencer to consider all of the relevant mitigating evidence a defendant might present in imposing sentence." *Id.,* at 315 (citations omitted).

The *Penry* Court's conclusion that *Lockett* and *Eddings* dictated the rule sought by Penry, see 492 U. S., at 318–319, must be understood in terms of the Court's ruling in *Jurek,* and its application in later cases. We did not view *Lockett* and *Eddings* as creating a rule different from that relied upon in *Jurek;* rather, we indicated that *Lockett* and *Eddings* reaffirmed the reasoning in *Jurek,* see 492 U. S., at 317–319, and confirmed the necessity of its application to Penry's claim.

We also reject Parks' contention that the antisympathy instruction runs afoul of *Lockett* and *Eddings* because jurors who react sympathetically to mitigating evidence may interpret the instruction as barring them from considering that evidence altogether. This argument misapprehends the distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required, see *Gregg* v. *Georgia,* 428 U. S. 153, 189–195 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.), for the State to insist that "the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability

of the defendant, and not an emotional response to the mitigating evidence." *California* v. *Brown*, 479 U. S., at 545 (O'CONNOR, J., concurring). Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary. See *Gregg, supra,* at 189–195; *Proffitt* v. *Florida,* 428 U. S. 242, 252–253 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.); *Jurek* v. *Texas, supra,* at 271–272 (same); *Woodson* v. *North Carolina,* 428 U. S. 280, 303–305 (1976) (plurality opinion); *Roberts* v. *Louisiana,* 428 U. S. 325, 333–335 (1976) (plurality opinion). At the very least, nothing in *Lockett* and *Eddings* prevents the State from attempting to ensure reliability and nonarbitrariness by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a "reasoned *moral* response," *Brown,* 479 U. S., at 545 (emphasis in original), rather than an emotional one. The State must not cut off full and fair consideration of mitigating evidence; but it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice. See *id.,* at 541–543.

Given the above discussion, it is obvious that our decision in *California* v. *Brown* is of no assistance to Parks. In *Brown,* we held that an instruction telling the jury not to be "swayed by 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling'" during the sentencing phase did not violate the Eighth Amendment. See *id.,* at 542. We reasoned that a reasonable juror would interpret the instruction to ignore mere sympathy "as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence," and that it was not unconstitutional for a State to "prohibi[t] juries from basing

their sentencing decisions on factors not presented at the trial." *Id.*, at 542–543. Although we approved of the use of the antisympathy instruction given in *Brown*, Parks attempts to transform our reasoning in that case into a rule that the instruction given in his case violates the Eighth Amendment.

Parks' argument relies upon a negative inference: because we concluded in *Brown* that it was permissible under the Constitution to prevent the jury from considering emotions not based upon the evidence, it follows that the Constitution requires that the jury be allowed to consider and give effect to emotions that are based upon mitigating evidence. For the reasons discussed above, see *supra*, at 488–491, we doubt that this inference follows from *Brown* or is consistent with our precedents. The same doubts are shared by the clear majority of federal and state courts that have passed upon the constitutionality of antisympathy instructions after *Brown*. See *supra*, at 490–491. The fact remains, however, that even if we accept Parks' arguments, *Brown* itself was decided nearly four years after Parks' conviction became final. In order to gain the benefit, if any, of *Brown*, Parks must establish that the decision in *Brown* did not create a new rule. To do so, Parks must contend that *Lockett* and *Eddings* dictated our reasoning, albeit perhaps not the result, in *Brown*. Our discussion above makes it evident that they do not.

Having decided that the relief Parks seeks would necessitate the creation of a new rule, we must determine whether the rule would come within either of the two exceptions to the general principle that new rules will not be applied on collateral review. The first exception permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe, see *Teague*, 489 U. S., at 311, or addresses a "substantive categorical guarante[e] accorded by the Constitution," such as a rule "prohibiting a certain category of punishment for a class of defendants because of their status or offense." *Penry*,

492 U. S., at 329, 330.   Parks cannot invoke this exception. The rule sought by Parks would neither decriminalize a class of conduct nor prohibit the imposition of capital punishment on a particular class of persons.   See *Butler, ante,* at 415; cf. *Penry, supra,* at 329–330.

The second exception is for "watershed rules of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.   See *Teague, supra,* at 311 (plurality opinion); *Butler, ante,* at 416.   This exception is also inapplicable here.   Although the precise contours of this exception may be difficult to discern, we have usually cited *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), holding that a defendant has the right to be represented by counsel in all criminal trials for serious offenses, to illustrate the type of rule coming within the exception.   See, *e. g., Teague, supra,* at 311–312 (plurality opinion); *Stumes,* 465 U. S., at 653–654, and n. 4 (Powell, J., concurring in judgment).   Whatever one may think of the importance of respondent's proposed rule, it has none of the primacy and centrality of the rule adopted in *Gideon* or other rules which may be thought to be within the exception.   The objectives of fairness and accuracy are more likely to be threatened than promoted by a rule allowing the sentence to turn not on whether the defendant, in the eyes of the community, is morally deserving of the death sentence, but on whether the defendant can strike an emotional chord in a juror.

The judgment of the Court of Appeals is therefore reversed.

*It is so ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE BLACKMUN and JUSTICE STEVENS join except as to Part IV, dissenting.

Respondent Robyn Parks was sentenced to death for the murder of a gas station attendant.   After his conviction be-

came final in 1983, respondent brought a petition for writ of habeas corpus under 28 U. S. C. § 2254 (1982 ed.) challenging his conviction and death sentence. He alleged, *inter alia*, that an instruction given at the sentencing phase of his trial that told the jury to avoid "any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence," App. 13, deprived him of an individualized sentencing determination because a reasonable juror could have understood the instruction to bar consideration of relevant mitigating evidence. The Tenth Circuit, sitting en banc, agreed and vacated respondent's death sentence. *Parks* v. *Brown*, 860 F. 2d 1545 (1988). Today, the Court holds that respondent is not entitled to relief because his claim would require the application of a "new rule" that may not be applied retroactively on collateral review.[1] The Court displays undue eagerness to apply the new standard for retroactivity announced in *Butler* v. *McKellar, ante,* p. 407, at the expense of thoughtful legal analysis. I cannot countenance such carelessness when a life is at stake. I dissent.

---

[1] The Court of Appeals for the Tenth Circuit granted respondent relief before we decided *Teague* v. *Lane,* 489 U. S. 288 (1989). Although the case was briefed and argued after *Teague,* neither of the parties nor any *amicus* briefed the retroactivity issue. See also Tr. of Oral Arg. 11 ("Well you really haven't come here prepared to argue the *Teague* point and it's probably not fair to press you on it"). In such circumstances, I question the propriety of the Court's addressing the retroactivity issue in the first instance. Cf. *Teague, supra,* at 300 (*amicus* briefed issue). The wiser course would be to vacate the Tenth Circuit's decision and remand for reconsideration in light of *Teague* and the novel standard adopted in *Butler* v. *McKellar, ante,* p. 407. See *Zant* v. *Moore,* 489 U. S. 836 (1989) (remanding case after oral argument for reconsideration in light of *Teague*); see *ibid.* (BRENNAN, J., concurring) (appellate court should consider in first instance whether State waived any claim relating to retroactivity). The Court's application of the *new* doctrine of retroactivity adopted in *Teague* to bar relief on a claim that was litigated prior to that decision is contrary to basic fairness. See *Butler, ante,* at 422, n. 4 (BRENNAN, J., dissenting).

# I

In *Teague* v. *Lane*, 489 U. S. 288 (1989), the Court dramatically altered retroactivity doctrine as it applies to defendants challenging their confinement by the State through the collateral remedy of habeas corpus. The Court held that a habeas petitioner may not obtain relief from an unconstitutional conviction or sentence if his claim would require the recognition of a "new rule" of criminal procedure. *Id.*, at 310 (plurality opinion); *id.*, at 320 (STEVENS, J., joined by BLACKMUN, J., concurring in part and concurring in judgment). Today, in *Butler* v. *McKellar, ante,* at 415, the Court defines a "new rule" as one that was "susceptible to debate among reasonable minds" under law prevailing at the time the habeas petitioner's conviction became final. As I argued in my dissent in *Butler,* the Court's novel "reasonableness" review of state court convictions is incompatible with the fundamental purposes of habeas corpus. See *Butler, ante,* at 424–430.

The Court's decisions in the instant case and in *Butler* leave no doubt that the Court has limited drastically the scope of habeas corpus relief through the application of a virtually all-encompassing definition of "new rule." In this case, the Court concludes that respondent seeks a "new rule" because it determines that the few lower courts that have rejected similar challenges to an antisympathy instruction were not "unreasonable" for doing so. *Ante,* at 490 ("We thus cannot say that the large majority of federal and state courts that have rejected challenges to antisympathy instructions similar to that given at Park's trial have been unreasonable").[2] The majority's conclusion, however, is based on a

---

[2] As in *Butler,* the majority looks to decisions from other courts to discern the meaning of our precedents. See *Butler, ante,* at 412–415 (*Arizona* v. *Roberson,* 486 U. S. 675 (1988), not "dictated" by *Edwards* v. *Arizona,* 451 U. S. 477 (1981), because of Federal Circuit and state-court split). The mere recitation of lower court cases does little to resolve the question, however, because ultimately it is this Court's responsibility to clarify the scope of its own holdings. In addition, the majority omits any

fundamental misreading of *Lockett* v. *Ohio*, 438 U. S. 586 (1978), *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982), and *Penry* v. *Lynaugh*, 492 U. S. 302 (1989).

## A

Most of the majority opinion addresses the retroactivity of a claim not even raised by respondent. The majority mischaracterizes respondent's claim as one demanding that "jurors be allowed to base the sentencing decision upon the sympathy they feel for the defendant after hearing his mitigating evidence," *ante,* at 489, and holds that claim barred by *Teague.* See *ante,* at 488–494. But as counsel for respondent argued before this Court:

> "Mr. Parks asserts no constitutional right to a sympathetic or emotional jury. What he does assert under Woodson, Lockett, Eddings and their progeny is the entirely familiar claim upheld consistently by this Court of a right to a sentencer who has not been precluded from considering as a mitigating factor any aspect of a defendant's background, character or record in addition to the circumstances of his offense that he proffers as a basis for a sentence less than death." Tr. of Oral Arg. 19–20.

Respondent concedes the State's contention that a decision to impose the death penalty must reflect a "reasoned moral response" to the defendant's culpability. See, *e. g.,* Brief for Respondent 9. What he argues is that his jury could have *interpreted* the antisympathy instruction as barring consid-

---

reference to state-court decisions holding that an antisympathy instruction violated the Eighth Amendment. See, *e. g., People* v. *Lanphear*, 36 Cal. 3d 163, 165–166, 680 P. 2d 1081, 1082–1083 (1984); *Legare* v. *State*, 250 Ga. 875, 877–878, 302 S. E. 2d 351, 353–354 (1983). The Court must do more than simply cite cases rejecting a similar claim to support its conclusion that a state-court decision was "reasonable." See *Butler, ante,* at 420–421 (BRENNAN, J., dissenting).

eration of mitigating evidence. More specifically, he claims that because much of the mitigating evidence relevant to his culpability also evoked sympathy, a juror who reacted sympathetically to the evidence would have believed that he was not entitled to consider that evidence *at all*—not even for its "moral" weight.[3] See *id.*, at 10 ("[A]n antisympathy charge by the court, exploited by the prosecutor's remarks, erected a barrier to full consideration of mitigating proof about [respondent's] background. Since these circumstances compromised respondent's chance to obtain a reasoned moral response from the jurors who held his life in the balance, his sentence is too unreliable to stand"). Respondent's actual claim, therefore, alleges nothing more than a violation of the rule recognized in *Lockett, supra*, and *Eddings, supra*, that a jury may not be prohibited from considering and giving effect

---

[3] As JUSTICE O'CONNOR has explained, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California* v. *Brown*, 479 U. S. 538, 545 (1987) (concurring opinion); see also *Penry* v. *Lynaugh*, 492 U. S. 302, 322 (1989) ("Because Penry was mentally retarded . . . and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, and because of his history of childhood abuse, [a] juror could . . . conclude that Penry was less morally 'culpable than defendants who have no such excuse'"). Yet the fact that the evidence is relevant to the jury's moral judgment about the defendant's actions does not rule out the possibility that the evidence may also evoke sympathy in the jurors. See *California* v. *Brown, supra*, at 548 (BRENNAN, J., dissenting) ("In forbidding the sentencer to take sympathy into account, this language on its face precludes precisely the response that a defendant's evidence of character and background is designed to elicit, thus effectively negating the intended effect of the Court's requirement that all mitigating evidence be considered"). JUSTICE O'CONNOR's concurrence in *California* v. *Brown, supra*, implicitly recognized this possibility. See *id.*, at 545–546 ("[O]ne difficulty with attempts to remove emotion from capital sentencing . . . is that juries may be misled into believing that mitigating evidence about a defendant's background or character also must be ignored").

to all relevant mitigating evidence when deciding whether to impose the death penalty.

It was on this claim that the Tenth Circuit granted respondent habeas corpus relief. 860 F. 2d, at 1556. The court reasoned as follows:

> "'Mercy,' 'humane' treatment, 'compassion,' and consideration of the unique 'humanity' of the defendant, which have all been affirmed as relevant considerations in the penalty phase of a capital case, all inevitably involve sympathy or *are sufficiently intertwined with sympathy* that they cannot be parsed without significant risk of confusion in the mind of a reasonable juror. . . .
>
> Without placing an undue technical emphasis on definitions, it seems to us that sympathy is likely to be perceived by a reasonable juror as an essential or important ingredient of, if not a synonym for, 'mercy,' 'humane' treatment, 'compassion' and a full 'individualized' consideration of the 'humanity' of the defendant and his 'character.'" *Ibid.* (emphasis added).

In holding that the antisympathy instruction "undermined the jury's ability to consider fully [respondent's] mitigating evidence," the Tenth Circuit was careful to distinguish the claim at issue from the distorted version of respondent's claim that the Court revives today:

> "That argument misconstrues the issue. The issue is not whether unbridled sympathy itself is a proper mitigating factor. Rather, the issue is whether an *absolute* anti-sympathy instruction presents an impermissible danger of interfering with the jury's consideration of proper mitigating evidence. We hold that it does. The Supreme Court has made it clear that such a risk is 'unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.'" *Id.,* at 1557 (quoting *Lockett, supra,* at 605) (emphasis in original).

## B

Under *Teague*, respondent's claim must be decided according to the "prevailing law" at the time his conviction became final in 1983 unless his claim falls within one of the two exceptions to the general nonretroactivity presumption. See *Teague*, 489 U. S., at 311. By 1983, this Court had unequivocally held that a sentencer may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U. S., at 604; see also *Eddings*, 455 U. S., at 113–114 ("Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence"); *id.*, at 115, n. 10 (when state law allows defendant to present any relevant mitigating evidence, "*Lockett* requires the sentencer to listen"). Despite the fact that respondent's conviction was final after both *Lockett* and *Eddings* were decided, the Court today holds that respondent is not entitled to habeas corpus relief because his claim requires the application of a "new rule" of criminal procedure. The majority states that although *Lockett* and *Eddings* may "inform, or even control or govern" such a claim, they do not "*compel*" the rule Parks seeks. *Ante*, at 491. The Court reasons that *Lockett* and *Eddings* answered only the question "*what* mitigating evidence the jury must be permitted to consider in making the sentencing decision" and not "*how* it must consider the mitigating evidence." *Ante*, at 490 (emphasis in original); see *ibid.* ("There is a simple and logical difference between rules that govern what factors the jury must be permitted to consider . . . and rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision").

Respondent does not, however, raise a claim challenging *how* the jury considered mitigating evidence. As explained

above, he argues that his jury could have believed it could not consider his mitigating evidence's bearing on moral culpability *at all*. Thus, his claim clearly falls within the the holdings of *Lockett* and *Eddings* even under the majority's reading of those cases. The *real* question in this case is whether the rule of *Lockett* and *Eddings* was violated. Resolution of respondent's claim involves only the otherwise familiar inquiry into the sufficiency of the jury instructions, not the recognition of a new principle of law. See, *e. g., Hitchcock* v. *Dugger*, 481 U. S. 393, 397 (1987); *California* v. *Brown*, 479 U. S. 538 (1987). The Court's conclusion that respondent seeks a "new rule" when he claims that the jury was "prevent[ed] . . . from giving independent mitigating weight to aspects of [his] character and record and to circumstances of the offense proferred in mitigation," *Lockett, supra*, at 605, is disingenuous.

Moreover, the majority's limited reading of *Lockett* and *Eddings* was rejected last Term in *Penry* v. *Lynaugh*, 492 U. S. 302 (1989). In that case, we held that *Teague* did not bar a habeas petitioner from raising the claim that the Texas death penalty statute deprived him of an individualized sentencing determination by limiting the *effect* the jury could give to relevant mitigating evidence. 492 U. S., at 318. We explained:

> "[I]t was clear from *Lockett* and *Eddings*, that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or the circumstances of the offense that mitigate against imposing the death penalty." *Ibid.*

Penry argued that although a Texas jury was able to give *some* effect to the evidence of mental retardation, the evidence "ha[d] relevance to his moral culpability beyond the

scope of the special issues, and . . . the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment." *Penry, supra*, at 322.[4]  In sustaining Penry's challenge, we expressly rejected the argument that although the State may not bar "consideration" of all relevant mitigating evidence, it may channel the "effect" the sentencer gives the evidence. We stated that "'the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration' in imposing sentence."  492 U. S., at 321 (quoting *Franklin* v. *Lynaugh*, 487 U. S. 164, 185 (1988) (O'CONNOR, J., concurring)).[5]  See also *Penry, supra*, at 327

---

[4] The majority's contention that Penry's "claim was that the Texas system prevented the jury from giving *any* mitigating effect to the evidence of his mental retardation," *ante*, at 491 (emphasis added), is simply incorrect.  *Penry*, 492 U. S., at 318.  In addition, the majority's effort to premise *Penry* solely on *Jurek* v. *Texas*, 428 U. S. 262 (1976), rather than on *Lockett* and *Eddings* as well, is unavailing.  *Jurek* dictated the result in *Penry* because *Jurek* held that a State may not limit the jury's ability to consider and give effect to mitigating evidence.  See *Penry, supra*, at 318–319 ("The rule Penry seeks—that when such mitigating evidence is presented, Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed—is not a 'new rule' under *Teague* because it is dictated by *Eddings* and *Lockett*.  Moreover, in light of the assurances upon which *Jurek* was based, we conclude that the relief Penry seeks does not 'impos[e] a new obligation' on the State of Texas") (quoting *Teague*, 489 U. S., at 301).

[5] See also *Franklin* v. *Lynaugh*, 487 U. S., at 193 (STEVENS, J., dissenting) ("There is no constitutionally meaningful distinction between allowing the jury to hear all the evidence the defendant would like to introduce and then telling the jury to consider that evidence only to the extent that it is probative of one of the enumerated mitigating circumstances, which we held unconstitutional in both *Lockett* and *Hitchcock* [v. *Dugger*, 481 U. S. 393 (1987)], and allowing the jury to hear whatever evidence the defendant would like to introduce and then telling the jury to consider that evidence only to the extent that it is probative of [one of the Texas special issues]").

("'In contrast to the carefully defined standards that must narrow a sentencer's discretion to *impose* the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence'") (quoting *McCleskey* v. *Kemp,* 481 U. S. 279, 304 (1987)).

The majority struggles mightily to distinguish rules that govern a jury's ability to "consider," "weigh," and "give effect to" mitigating evidence from rules relating to the *"manner* in which [the] mitigating evidence can be considered." *Ante,* at 491 (emphasis added). This distinction is meaningless for a rule that limits the *manner* in which the jury considers mitigating evidence is unconstitutional if it limits the jury's ability to consider and give effect to that evidence. But under the majority's approach, a law requiring the jury to discount the weight of all, or of certain, mitigating factors would be consistent with *Lockett* so long as the majority could describe the statute as relating to the "manner" in which the jury considers the evidence despite such a statute's obvious preclusive effect. Cf. *McKoy* v. *North Carolina, ante,* at 465–466 (SCALIA, J., dissenting) (requirement that jury unanimously agree that mitigating circumstance exists is not a restriction on the jury's ability to give effect to mitigating evidence, but only on the *"manner* in which it was allowed to do so—viz., only unanimously") (citing *ante,* at 490).

Indeed, the majority's language is strangely reminiscent of the argument trumpeted by JUSTICE SCALIA in *Penry.* JUSTICE SCALIA, writing for four Members of the Court, argued that "it could not be clearer that *Jurek* adopted the constitutional rule that the instructions had to render all mitigating circumstances relevant to the jury's verdict, but that the precise manner of their relevance—the precise *effect* of their consideration—could be channeled by law." *Penry, supra,* at 355 (opinion concurring in part and dissenting in part). The Court correctly rejected that position in *Penry,* and its failure to do so today creates considerable ambiguity

about which *Lockett* claims a federal court may hereafter consider on habeas corpus review.

## C

Because the majority concludes that the claim respondent presses would constitute a "new rule," it must proceed to consider whether the claim fits within the second exception to the *Teague* doctrine of nonretroactivity.[6] A plurality of the Court in *Teague* concluded that only those new rules that amount to "bedrock procedural" rules "without which the likelihood of an accurate conviction is seriously diminished" should be applied retroactively. *Teague*, 489 U. S., at 313. Today, a majority of the Court adopts this crabbed construction of the second exception and holds that the exception is limited to "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." *Ante*, at 495 (quoting *Teague, supra,* at 311); see also *Butler, ante,* at 416. Beyond such generalities, the majority offers no guidance despite its concession that the "precise contours of this exception may be difficult to discern." *Ante,* at 495.

The determination with which the Court refuses to apply this exception to a capital sentencing error is most disturbing and is remarkably insensitive to the fundamental premise upon which our Eighth Amendment jurisprudence is built. This Court has consistently "recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California* v. *Ramos,* 463 U. S. 992, 998–999 (1983). If the irrevocable nature of the death penalty is not sufficient to counsel against application of Justice Harlan's doctrine of limited retroactivity for collateral re-

---

[6] The first exception permits the retroactive application of a "new rule" that places primary conduct beyond the power of the State to punish. *Teague, supra,* at 311. This exception is not relevant here.

view altogether,[7] it should at least inform the determination of the proper scope of the second *Teague* exception in capital cases.[8] Moreover, the majority's insistence that a rule must enhance the accuracy of the *factfinding process* in order to fit within the second exception is difficult to justify in the context of capital sentencing. The decision whether to impose the death penalty represents a moral judgment about the defendant's culpability, not a factual finding. See *Teague, supra,* at 321 (STEVENS, J., concurring in part and concurring in judgment) ("[A] touchstone of factual innocence would provide little guidance in . . . cases, such as those challenging the constitutionality of capital sentencing hearings"). Cf. *Smith v. Murray,* 477 U. S. 527, 537 (1986). Thus, the scope of the exception should be tailored to the unique nature of the sentencing decision.

---

[7] But see *Teague,* 489 U. S., at 321, n. 3 (STEVENS, J., concurring in part and concurring in judgment) (explaining that one of the main reasons for limited retroactivity on habeas—promoting rehabilitation—is "wholly inapplicable" in capital cases) (citing *Mackey* v. *United States,* 401 U. S. 667, 690–691 (1971)).

[8] In *Penry,* the Court refined the scope of the first *Teague* exception in light of the unique nature of the death penalty. "Although *Teague* read [the first] exception as focusing solely on new rules according constitutional protection to an actor's primary conduct, . . . [i]n our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all." *Penry,* 492 U. S., at 329–330. The scope of the second exception also should reflect the unique consequences of errors at the sentencing phase of a capital trial.

In addition, the plurality in *Teague* implied that the scope of the second exception was narrow because most fundamental rules of procedure have already been established. The Court today apparently rests its cursory treatment of this issue on that same assumption. Regardless of the validity of that premise with respect to rules pertaining to the guilt phase, that understanding is unsupportable when dealing with issues in the capital sentencing context. "In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases." *Ake* v. *Oklahoma,* 470 U. S. 68, 87 (1985) (Burger, C. J., concurring in judgment).

The foremost concern of the Eighth Amendment is that the death sentence not be imposed in an arbitrary and capricious manner. See, *e. g., Gregg* v. *Georgia,* 428 U. S. 153, 188 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.). To comply with this command, a State must narrow the class of defendants eligible for the death penalty and must also ensure that the decision to impose the death penalty is individualized. See *California* v. *Brown,* 479 U. S., at 541. The right to an individualized sentencing determination is perhaps the most fundamental right recognized at the capital sentencing hearing. See *Woodson* v. *North Carolina,* 428 U. S. 280, 304 (1976) (plurality opinion) ("[T]he fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death") (citation omitted). "The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence." *Lockett,* 438 U. S., at 605 (plurality opinion); see *Blystone* v. *Pennsylvania, ante,* at 307 ("The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence"). Rules ensuring the jury's ability to consider mitigating evidence guarantee that the jury acts with full information when formulating a moral judgment about the defendant's conduct. Because such rules are integral to the proper functioning of the capital sentencing hearing, they must apply retroactively under the second *Teague* exception. Thus, even if respondent's claim constitutes a "new rule," it must fall within the second exception. I fear that the majority's failure to provide any principled analysis explaining why the second *Teague* exception does not apply in this case reflects the Court's growing displeasure with the litigation of capital cases on collateral review.

## II

For the same reasons that *Lockett* and *Eddings* compel the conclusion that respondent does not seek a "new rule" under *Teague,* these cases also compel the conclusion that respondent was denied an individualized sentencing determination as required by the Eighth Amendment. As JUSTICE O'CONNOR has recognized, "one difficulty with attempts to remove emotion from capital sentencing through [antisympathy] instructions . . . is that juries may be misled into believing that mitigating evidence about a defendant's background or character also must be ignored." *California* v. *Brown,* 479 U. S., at 545–546 (concurring opinion) (citing *id.,* at 555 (BRENNAN, J., dissenting)). That is exactly what happened in this case: in all likelihood the jury interpreted the antisympathy instruction as a command to ignore the mitigating evidence.

When reviewing the validity of particular jury instructions, the Court has consistently held that "[t]he question . . . is not what [this Court] declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning." *Francis* v. *Franklin,* 471 U. S. 307, 315–316 (1985) (citing *Sandstrom* v. *Montana,* 442 U. S. 510, 516–517 (1979)). Until this Term, there had been little disagreement with this standard. Today, however, a majority of the Court reformulates the appropriate inquiry as "whether there is a reasonable likelihood that the jury has applied the challenged instruction" in an unconstitutional manner. *Boyde* v. *California, ante,* at 380.[9] Under

---

[9] As JUSTICE MARSHALL ably demonstrates in his dissent in *Boyde,* the majority engages in a sleight of hand to justify the reformulation of the standard of review. See *Boyde, ante,* at 387 (MARSHALL, J., dissenting). But in the end, it is unclear how the majority's "reasonable likelihood" standard differs from the prior inquiry into how a reasonable juror could have interpreted the instruction. See *Boyde, ante,* at 392 (MARSHALL, J., dissenting) ("It is difficult to conceive how a *reasonable* juror *could* interpret an instruction unconstitutionally where there is no 'reasonable likelihood' that a juror would do so"). To the extent that this new standard is stricter than the standard set forth in *Francis,* I believe it is "irreconcilable

either the *Francis* or *Boyde* approach, the antisympathy instruction given in this case was unconstitutional because it interfered with the jury's ability to consider mitigating evidence presented by respondent.

## A

"To determine how a reasonable juror could interpret an instruction, we 'must focus initially on the specific language challenged.' . . . If the specific instruction fails constitutional muster, we then review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law." *California* v. *Brown, supra,* at 541 (quoting *Francis, supra,* at 315–316).[10]  In this case, the jury was instructed to "avoid *any* influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence." App. 13 (emphasis added).  This instruction is distinguishable from the one upheld in *California* v. *Brown, supra.*  In that case, the Court rejected the argument that a reasonable juror could have interpreted an instruction not to be "swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" as a command not to consider mitigating evidence.  The Court held instead that a reasonable juror would have understood "the instruction not to rely on '*mere* sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase."  479 U. S., at 542

---

with bedrock due process principles." *Francis,* 471 U. S., at 322–323, n. 8.  Moreover, a stricter standard is especially inappropriate when reviewing the instructions at the sentencing stage of a capital trial.  "In death cases doubts [concerning a juror's interpretation of an instruction] should be resolved in favor of the accused." *Andres* v. *United States,* 333 U. S. 740, 752 (1948).  See also *Boyde, ante,* at 392–394 (MARSHALL, J., dissenting).

[10] "This analysis 'requires careful attention to the words actually spoken to the jury . . . , for whether a defendant has been accorded his constitutional rights depends on the way in which a reasonable juror could have interpreted the instruction.'" *Francis, supra,* at 315 (quoting *Sandstrom* v. *Montana,* 442 U. S. 510, 514 (1979)).

(emphasis added). Because the jury in this case was told not to consider *any* sympathy—rather than "mere sympathy"—it is more likely that the jury at respondent's trial understood that when making a moral judgment about respondent's culpability, it was forbidden to take into account any evidence that evoked a sympathetic response.

The context of the sentencing proceedings bolsters this conclusion. The only mitigating evidence proffered by respondent was testimony about his deprived background from his father. Although this evidence was relevant to the sentencing decision because it bore on respondent's culpability, a juror's initial reaction to this evidence might have been to feel sympathy for respondent because of his hardship. A juror who conscientiously followed the instruction to avoid *any* sympathy would have believed that he was required to ignore the father's testimony altogether since only by excluding it completely from consideration could he eliminate all feelings of sympathy for respondent. Moreover, because the father's testimony did not fit within the mitigating circumstances listed by the judge, it was all the more likely that a juror believed that the father's testimony was irrelevant to the sentencing decision.[11] See *California* v. *Brown, supra,*

---

[11] The trial judge instructed the jury as follows:

"The minimum mitigating circumstances are:

"1. The defendant has no significant history of prior criminal activity;

"2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;

"3. The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act;

"4. The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct;

"5. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;

"6. The defendant acted under duress or under the domination of another person;

"7. At the time of the murder the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to

at 550 (BRENNAN, J., dissenting) ("It is . . . likely . . . that jurors instructed not to rely on sympathy would conclude that the defendant had simply gone too far in his presentation, and that, as in other trial contexts, the jury must look to the judge for guidance as to that portion of the evidence that appropriately could be considered").

Indeed, the prosecutor's closing argument maintained that respondent's presentation at the sentencing phase constituted an illegitimate sympathy ploy and that the jury was *required* to ignore it.[12]   After explaining that none of the minimum mitigating circumstances were supported by the evidence, the prosecutor argued:

> "[Defense counsel's] closing arguments are really a pitch to you for sympathy—sympathy, or sentiment or prejudice; and you told me in voir dire you wouldn't do that.
> "Well it's just cold turkey.   He either did it or he didn't.   He either deserves the death penalty or he doesn't, you know.   You leave the sympathy, and the sentiment and prejudice part out of it."   App. 75.

Given the sparse amount of evidence presented at the sentencing phase and the prosecutor's theme that the jury's de-

---

the requirement of the law was impaired as a result of mental disease or intoxication;

"8. The age of the defendant at the time of the crime."   App. 11–12.

[12] Although the prosecutor's comments do not have the force of law, they often are a useful aid in determining how a reasonable juror could have interpreted a particular instruction.   See *Boyde, ante,* at 385 ("[A]rguments of counsel, like the instructions of the court, must be judged in the context in which they are made"); see also *Brown,* 479 U. S., at 553 (BRENNAN, J., dissenting).   This is especially true in the instant case because the trial court instructed the jury on the law before the prosecutor and defense counsel gave closing argument.   5 Tr. 694–733.   Thus, the prosecutor's argument was the last thing the jury heard before it began its deliberations.

liberations were to be purely mechanical,[13] there is a reasonable likelihood that the jury believed that the antisympathy instruction barred it from considering respondent's deprived background as a valid reason not to impose the death penalty.

Nothing in the other instructions ensured that the antisympathy instruction would be correctly understood. The trial judge did instruct the jury that it was required to consider a list of minimum mitigating circumstances and that it was free to consider any other factor it deemed mitigating,[14] but these instructions did not cure the infirmity of the anti-

---

[13] The prosecutor stressed this theme from the beginning of the trial. At *voir dire*, he told the jury: "Of course the Court will instruct you that you should not allow sympathy, sentiment or prejudice to enter into your deliberations. And frankly that's just as cold-blooded as you can put it. . . . [Y]ou can be as sympathetic as you want to . . . be, but you can't do it and sit on this jury." App. 8–9. The rest of his closing argument was calculated to assure the jury that their conscience should not bother them because the criminal justice system required that the decision to put respondent to death be "cold-blooded." He argued:

"[Y]ou're not yourself putting Robyn Parks to death. You just have become a part of the criminal justice system that says when anyone does this, that he *must* suffer death. So all you are doing is you're just following the law, and what the law says, and on your verdict — once your verdict comes back in, the law takes over. The law does all of these things, so it's not on your conscience. You're just part of the criminal justice system that says when this type of thing happens, that whoever does such a horrible, atrocious thing *must* suffer death.

"Now that's man's law. But God's law is the very same. God's law says that the murderer shall suffer death. So don't let it bother your conscience, you know." *Id.*, at 39–40 (emphasis added).

[14] The jury was told:

"You must consider all the following minimum mitigating circumstances and determine whether any one or more of them apply to all of the evidence, facts and circumstances of this case. You are not limited in your consideration of the minimum mitigating circumstances set out herein, and you may consider any other or additional mitigating circumstances, if any, that you may find from the evidence to exist in this case. What facts or evidence that may constitute an additional mitigating circumstance is for the jury to determine." *Id.*, at 10–11.

sympathy instruction. Although the judge informed the jury in broad terms that it could consider all relevant mitigating evidence, he never defined the concept of mitigation for the jury. But the jury *was* told that it could not consider "sympathy" and nothing in the jury instructions explained that the command to avoid sympathy did not preclude the consideration of mitigating evidence. At best, then, the instructions sent contradictory messages. "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." *Francis,* 471 U. S., at 322. "Unless we can rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground, we must remand for resentencing." *Mills* v. *Maryland,* 486 U. S. 367, 377 (1988).

## B

The majority suggests that *Lockett* and *Eddings* do not compel the invalidation of the antisympathy instruction because the instruction ensures that the decision to impose the death penalty is "a 'reasoned *moral* response,' rather than an emotional one." *Ante,* at 493 (citation omitted; emphasis in original). Although some recent cases have stated that the decision to impose the death penalty must be a moral decision, see *Brown,* 479 U. S., at 545 (O'CONNOR, J., concurring); *Penry,* 492 U. S., at 319; *Franklin* v. *Lynaugh,* 487 U. S., at 184, 185 (O'CONNOR, J., concurring), those cases have not clearly defined the difference between a "reasoned moral response" and an "emotional" one. Indeed, our earlier cases recognized that "sympathy" is an important ingredient in the Eighth Amendment's requirement of an individualized sentencing determination. In *Woodson* v. *North Carolina,* 428 U. S. 280 (1976), a plurality of the Court held that "[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circum-

stances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of *compassionate* or *mitigating* factors stemming from the diverse frailties of humankind." *Id.*, at 304 (emphasis added). The description of "mitigating evidence" as "compassionate or mitigating factors" necessarily includes the concept of sympathy, because "sympathy" is fairly regarded as a synonym for "compassion." Webster's New International Dictionary 544 (2d ed. 1957); Funk & Wagnalls New Standard Dictionary 541 (1952).

We can debate whether sympathy is an emotional reaction that has no place in a decision to impose the death penalty or whether sympathy, although an emotion, plays an important role in forming the jury's *moral* response to the defendant's actions. But this debate is an irrelevant academic exercise if in a particular case the jury is not *informed* of the distinction between the type of reaction to mitigating evidence that is an invalid emotional response and the type of reaction that is an acceptable "reasoned moral response." This Court's incantation of that talismanic phrase cannot hide the fact that the jury instructions in this case did not clearly inform the jurors that their decision whether to impose the death penalty—the most severe sanction available to society—should represent a moral judgment about the defendant's culpability in light of all the available evidence. I would think the Court would at least ensure that *its* views about the propriety of the death penalty were the ones actually transmitted to the jury.

## III

The instructions at the sentencing phase of respondent's trial may well have misled the jury about its duty to consider the mitigating evidence respondent presented. Until today, the Court consistently has vacated a death sentence and remanded for resentencing when there was any ambiguity about whether the sentencer actually considered mitigating evidence. See *Eddings* v. *Oklahoma*, 455 U. S., at 119

(O'CONNOR, J., concurring) ("*Woodson* and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by the [sentencer]"). See also *Penry, supra,* at 328; *Mills, supra,* at 377; *Hitchcock,* 481 U. S., at 399; *Skipper* v. *South Carolina,* 476 U. S. 1, 8 (1986); *Lockett,* 438 U. S., at 608. The Court's failure to adhere to this fundamental Eighth Amendment principle is inexcusable. Distorting respondent's claim and our precedents in order to hide behind the smokescreen of a new standard of retroactivity is even more so.

## IV

Even if I did not believe that the antisympathy instruction interfered with the jury's ability to consider and give effect to mitigating evidence, I would vacate respondent's death sentence. I adhere to my view that the death penalty is in all circumstances cruel and unusual punishment. *Gregg* v. *Georgia,* 428 U. S., at 227.