**Miguel A. RICHARDSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 68934.

Court of Criminal Appeals of Texas, En Banc.

June 12, 1991.

Rehearing Denied Sept. 18, 1991.

770

Allen Cazier, San Antonio, Steven B. Rosenfeld, New York City, for appellant.

Fred G. Rodriguez, Former Dist. Atty., Edward F. Shaughnessy, III, Keith Burris, Steve Hilbig, James L. Bruner, Daniel Thornberry, Asst. Dist. Attys., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

McCORMICK, Presiding Judge.

Appellant, Miguel A. Richardson, was convicted of capital murder and the death penalty was assessed. This Court affirmed the conviction holding in part that appellant's contention that the trial court erred in refusing his requested charges on mitigation had no merit. *Richardson v. State,* 744 S.W.2d 65, 85 (Tex.Cr.App.1987).

Appellant challenged our holding in the Supreme Court of the United States. That Court, 492 U.S. 914, 109 S.Ct. 3235, 106 L.Ed.2d 583 summarily granted appellant's petition for writ of certiorari, vacated the judgment of this Court and remanded the case to us to consider appellant's allegations in light of *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). We again affirm the conviction.[1]

In *Penry,* the United States Supreme Court held that the petitioner's mental retardation and history of child abuse constituted mitigating evidence that either was not rele-

vant to the Texas special verdict issues or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions. *Penry,* 492 U.S. at 323, 109 S.Ct. at 2949. In the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, the Supreme Court concluded that the jury did not have a vehicle to express its "reasoned moral response" to its sentencing decision. *Penry,* 492 U.S. at 326, 109 S.Ct. at 2951. Justice O'Connor writing for the majority emphasized that:

> "[I]t is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense. Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a 'reasoned *moral* response to the defendant's background, character, and crime.'" (emphasis in original) (citations omitted) *Penry,* 109 S.Ct. at 2951.

Our analysis will also consider *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion) and *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). We think it appropriate to give consideration to the time when evidence that has been termed "mitigating" occurred. Justice White, writing for the plurality in *Franklin,* specifically referred to *Skipper* when discussing the relevance of a prison disciplinary record. He wrote:

> "Indeed, our discussion in Skipper of the relevancy of such disciplinary record evidence in capital sentencing decisions dealt exclusively with the question of how such evidence reflects on a defendant's likely future behavior.... [S]kipper's discussion of the proper use of a defendant's prison

---

1. We will not review appellant's second point of error. It is outside the scope of the Supreme

Court's remand order.

disciplinary record in a jury's sentencing decision focused precisely on the way in which such evidence is encompassed by the Texas future dangerousness question, and on the Court's previous decision in Jurek." *Franklin*, 487 U.S. at 178, 108 S.Ct. at 2329.

We will now consider whether the appellant is correct in his contention that the evidence he presents is, in fact, *Penry* evidence and whether a special instruction should have been granted so that the jury could have made a "reasoned moral response" in answering our special issues. The case may be that appellant's evidence falls under the ambit of *Penry,* is *Franklin* evidence, or has no mitigating value at all in the context of his capital murder punishment phase.

Appellant has grouped what he wishes us to consider "mitigating evidence" into five categories for our consideration. The categories are:

(1) Voluntary service and kindness to others;

(2) Religious devotion;

(3) Artistic and poetic talent;

(4) Family ties; and

(5) Childhood abuse; mental and emotional impairment.

We will now examine the evidence under each category in light of *Penry* and *Franklin.*

## VOLUNTARY SERVICE AND KINDNESS TO OTHERS

■ Linda Cowart testified that she met the appellant at a Sambo's restaurant in Denver, Colorado. Cowart characterized their relationship as a "friendship" and that they talked about "people going by, cars going up and down the street." This relationship continued after appellant was incarcerated in Denver. Cowart also testified that she suffered from diabetes and as a result was losing her eyesight. She commented that appellant expressed concern over her medical condition in letters and conversation. The record is not clear on whether appellant's concern for Cowart's vision problems occurred before or after his incarceration. Nevertheless, the character and quality of this testimony is not remotely related to the kind of evidence that prompted a reversal in the *Penry* case. Appellant has attempted to posture the Cowart testimony as indicative of lifelong qualities that somehow entitle him to a *Penry* charge. We do not agree and see Cowart's testimony as nothing more than an appeal for "sympathy or emotion." See *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). Appellant also fails to point out that Cowart was asked about the disposition of appellant. Cowart testified:

"Q. Have you ever known him to be a violent individual?

"A. No, sir.

"Q. Have you ever observed him to have an uncontrollable temper?

"A. No. Any time I've been around him he's always been kind of a happy go lucky person. I've never seen him down. I've never seen him even slightly perturbed about anything."

Considering Cowart's testimony as a whole and disregarding the patent appeals to sympathy and emotion based on the witness' alleged disability, we hold that the jury had the opportunity to give effect to Cowart's testimony through special issue number two regarding future dangerousness. See *Franklin,* 487 U.S. at 180, 108 S.Ct. at 2330.

■ Cynthia Lee took the stand and related that she was a resident of Denver, Colorado who had known appellant for four or five years. Lee met appellant in a lounge after bumping into him. Lee testified that she had never dated appellant but they had gone on outings to the mountains. Appellant focuses on the portion of Lee's testimony that describes appellant's relationship with Karen Cracken. Lee described Cracken, a fourteen year old, as coming from a troubled background and as suffering from mental and physical problems. Lee stated that appellant's phone calls, letters, drawings and poetry gave Cracken a different perspective on life. What the brief for appellant does not point out is that appellant never met Cracken face to face and the relationship that is described took place within the time frame of

appellant's incarceration. We have several thoughts on the value of Lee's testimony.

We consider appellant's focus on the physical and mental condition of "his friend" as nothing more than a transparent attempt to bring "sympathy" evidence under the purview of the Eighth Amendment for purposes of a *Penry* charge.

Even more damaging to appellant's assertion that Lee's testimony entitles him to a *Penry* charge is the testimony from Lee that appellant was a nonviolent person. On direct examination the following exchange occurred:

"Q. What type of personality does Miguel have?

"A. Very pleasant and just real jolly. You know, he wants to know what is going on around him.

"Q. Have you ever observed him to be a violent individual?

"A. Not at all. No.

"Q. Have you ever observed him to be mean or vicious towards other people?

"A. Never."

Lee's testimony, taken as a whole, goes directly to the question of future dangerousness and the jury had the opportunity to give mitigating effect to her testimony through special issue number two. See *Franklin,* 487 U.S. at 180, 108 S.Ct. at 2330.

### ARTISTIC AND POETIC TALENT

■ We next confront the evidence of appellant's artistic and poetic talent and its Eighth Amendment value in the context of *Penry.* The brief for appellant contends that the defense presented evidence of Richardson's "significant worth" to society as an artist and poet. Cynthia Lee, a friend of appellant, literally gushed forth with descriptions of appellant's talents. She stated when describing a picture he had drawn: "It was real intensifying." As to appellant's poetry Lee stated: "You can't pickup (sic) a book and read poetry that is as good as a lot of this. Some are short and some of them are three, four, five pages long. Some of them a lot longer than that. They are gorgeous."

Several other witnesses gave passing assessments of appellant's artistic and poetic ability. Paquita Richardson, appellant's sister, testified that appellant was a poet. Kabelitz, appellant's boyhood minister, also offered his opinion as to the artistic abilities of the appellant. Kabelitz testified that appellant had artistic ability and on occasion would receive appellant's drawings which were of a religious nature. Cowart, also a friend of appellant, mentioned that she had received small drawings on the outside of envelopes and had read "some poetry" by appellant. Bernard, another minister, also testified that appellant could draw.

We reject appellant's contention that the testimony offered establishes appellant's "significant worth" as an artist or poet. *Penry,* at the least, *appears* to demand evidence demonstrating lifelong dedication to the arts or poetry in order to gain status as Eighth Amendment mitigating evidence. *Penry,* 492 U.S. at 324, 109 S.Ct. at 2950 (discussing severity of petitioner's afflictions). If we accept appellant's contention that this kind of evidence deserves a reversal based on *Penry* then *Penry* itself is nothing more than an automatic reversal rule and brings into question the facial validity of our capital murder sentencing scheme. *Penry* implicitly reaffirmed the facial constitutionality of the Texas death penalty statute. 492 U.S. at 317–318, 109 S.Ct. at 2946–2947 (Supreme Court noting that "the facial validity of the Texas death penalty statute had been upheld in *Jurek* on the basis of assurances that the special issues would be interpreted broadly enough ... [and that] Penry argues that those assurances were not fulfilled *in his particular case* ..." [emphasis in the original]).

Rather than attempt to shoehorn appellant's artistic and poetic abilities into the ambit of the second special issue, we choose to confront this issue directly and hold that the appellant's ability to draw pictures and write poems in the context of this case has no mitigating value in the sense that it was relevant to the jury making a "reasoned moral response" in voting on the special issues nor do those abilities have any particular relevance to the appellant's moral culpability outside the special issues. In this particular case, we think that appellant's artistic talents

do no more than strike an emotional chord that would cloud the jury's deliberations in reaching a decision. See *Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 1264, 108 L.Ed.2d 415, 429 (1990). See also *California v. Brown*, 479 U.S. at 544, 107 S.Ct. at 841 (O'Connor, J., concurring).

## CHILDHOOD ABUSE; MENTAL AND EMOTIONAL IMPAIRMENT

■ Appellant asserts the testimony of Ms. Richardson, his sister, supports his contention that he came from an abused background. To the contrary, Ms. Richardson, a space shuttle payload specialist with Boeing Aircraft, testified as follows:

"Q. [by appellant's counsel] Let me ask you this. Was your father strict at home?

"A. Yes. He was.

"Q. Was he when Miguel was very young, was your father a very, very strict disciplinarian?

"A. He was strict to us, of course being a child we never liked getting whippings or being told what to do, however, he was understanding, but if he said something he meant it."

We disagree with appellant's characterization of this testimony as indicative of an abused background. Ms. Richardson's testimony does nothing more than indicate appellant came from a normal background. Not one shred of her testimony mentions abuse, beatings, or other familial situations even remotely analogous to the mistreatment present in *Penry*.

Pastor Norb Kabelitz, a Lutheran minister from Oklahoma City, also testified about the general background and special talents of appellant. Appellant points to selected portions of the record which if taken out of context could lead one to believe that appellant suffered a variety of abuses worthy of a *Penry* charge. Close scrutiny of the record reveals otherwise.

Kabelitz testified as follows:

"Q. Pastor, let me ask you this. In the earlier days was Miguel a well behaved child?

"A. As normally well behaved as any of my others. Yes. Part of the youth group, the support group of the church. He played a role an acolyte in the church, communion. Sometimes not wanting to go to church like some kids do, etcetera, but he was there.

"Q. Was his father a strict disciplinarian?

"A. Yes.

"Q. Did you have occasion to visit in the home?

"A. Yes, often.

"Q. Okay.

"A. They meant the best for their children. The family from which Miguel comes is a well put together family, very strong father image. A mother who tried to do the best for their children. Middle class you might call them, hard working. He's at Tinker Air Force Base. The mother a homemaker and now working for a National Transportation Company...."

This testimony does not indicate that appellant received anything other than a middle class upbringing. At this point we reject any claim that Kabelitz' testimony brings appellant within the scope of *Penry* based on childhood abuse.

■ Kabelitz also offered testimony concerning the racial strife that occurred in Oklahoma City in the 1960's and the apparent effect on appellant. Kabelitz implied that the social turmoil of that period stunted the appellant's educational development. He also testified that appellant's teachers "put him down publicly in class, called [him] names and [used] innuendos." Richardson has also pointed to the testimony of Lillie Rex and her references to racial problems in Oklahoma City as supportive of this point. We do not believe that Kabelitz' or Rex' testimony about societal conditions in the 1960's and the name calling allegations have any significance to the appellant's moral culpability beyond the special issues or any relevance to the first two special issues. *Franklin*, 487 U.S. at 180, 108 S.Ct. at 2330.

Appellant has also attempted to establish a connection between his alleged abusive background and purported mental and emotional impairment as an adult. Appellant's multiple references to the record regarding Bearden, Seiver, Franklin, Laursen, Dunow, and the State's closing argument fail to establish any connection between alleged childhood abuse and its subsequent effect on appellant. There is simply no *Penry* evidence presented by the appellant's nexus argument. This Court will not engage in analysis of a theory that is illogical on its face and not supported by the record.

■ Appellant has also attempted to characterize the testimony of Robert Rast, a clinical psychologist, as indicative of Richardson's mental illness that had its roots in his childhood. Rast, however, was presented with a hypothetical based on the facts of the instant case and asked his opinion as to future dangerousness. Rast testified that in his opinion on direct and cross examination that the hypothetical "personality" in this case would be likely to commit future acts of violence. In closing argument on punishment, defense counsel again emphasized Rast's testimony for its potential value in the jury's deciding the question of future dangerousness. Counsel stated:

> "All right. You had an opportunity to hear and listen to a 'mental health professional' this morning, Doctor Rast. I assume that's what you will base your verdict on as to probability of future conduct."

Defense counsel's cross examination of Rast never established any connection between the diagnosis of sociopath and childhood experiences of Richardson. Rast's testimony went directly to the question of future dangerousness that could be properly considered under special issue number two.

■ Appellant also asserts that Kabelitz' testimony of appellant's reading problems puts him on equal footing with *Penry*. We reject appellant's argument. Difficulty with learning to read, in and of itself, cannot establish a *Penry* claim. Penry was diagnosed as mentally retarded, in and out of state schools, and never finished the first grade. *Penry*, 492 U.S. at 307, 109 S.Ct. at 2941. Appellant, on the other hand, did not suffer from the plethora of problems that *Penry* did. Difficulty with reading in the context of appellant's case does not reach the threshold that mandates a *Penry* instruction.

## RELIGIOUS DEVOTION

■ Several ministers other than Kabelitz testified as to the religious devotion of appellant. Doctor Griswold, a lay minister, had occasion to visit appellant during his incarceration in Denver. Griswold testified that appellant "came to a deep understanding of what the christian life is about."

Herbert Holston, minister and educator, also testified that appellant had made attempts to bring other persons to Christ. The record reflects that appellant's evangelical zeal took place while incarcerated in San Antonio.

Wayne Bernard, minister of the Randolph Church of Christ in Universal City, testified that appellant had studied the word of God for seven months. Bernard noted that he had seen a "real conversion within Miguel, and I think that is evidenced by the fact that I have never seen any acts of violence, verbal or physical from him in the seven months I have known him." Again, appellant's conversion took place during his incarceration in San Antonio.

Ralph Vickery, a deputy sheriff, testified that Richardson had a cross forcibly removed from around his neck. Appellant argues the forced removal is evidence of religious devotion; however, Vickery testified the cross was removed because of a general rule against allowing prisoners to wear necklaces in certain jail areas. Appellant has also offered the testimony of Lillie Rex his childhood Sunday School teacher. Rex stated that Richardson was faithful about coming to Sunday school.

The evidence of appellant's religious devotion is *Franklin* evidence and could be properly addressed by a jury answering issue number two. Appellant's jail house conversions demonstrate nothing more than his ability to adapt to a structured prison environment. We also note that the childhood minister of appellant, Pastor Kabelitz, did not testify about any significant religious de-

votion, of the character and quality, that would entitle appellant to a *Penry* instruction. The jury had ample opportunity to give effect to any mitigating value of appellant's religious zeal when they deliberated on the issue of future dangerousness. See *Franklin*, 487 U.S. at 180, 108 S.Ct. at 2329–30.

The judgment is affirmed.

CAMPBELL, J., concurs in the result.

BAIRD, J., dissents.

WHITE, J., not participating.

BENAVIDES, Judge, concurring.

I am unable to join the Court's opinion, but concur in its judgment. This case comes to us on remand from the United States Supreme Court so that we might reconsider our earlier disposition of it in light of *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Accordingly, we once again decide whether, under the Eighth Amendment, appellant was entitled to have his jury determine the mitigating significance, beyond that contemplated by the special punishment issues, of certain evidence proffered by him as a reason for imposition of a sentence less than death. This evidence was of several different kinds, and has been grouped for purposes of analysis into the following categories: (1) voluntary service and kindness to others; (2) religious devotion; (3) artistic and poetic talent; (4) family ties; and (5) childhood abuse, together with mental and emotional impairment.

As I perceive it, the central basis for the Supreme Court's opinion in *Penry* was that mitigating circumstances relevant to punishment within the meaning of the Eighth Amendment are those circumstances of "the defendant's background and character [which will support a] belief, long held by this society, that defendants who commit criminal acts that are attributable to [such circumstances] may be less culpable than defendants who have no such excuse." 492 U.S. at 319, 109 S.Ct. at 2947, 106 L.Ed.2d at 278, quoting *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (concurring opinion of O'Connor, J.). In my view, none of the evidence in the first four

categories suggested by appellant meets this criterion, for it seems reasonably clear to me that persons with a history of selflessness or community service, religious or family allegiance, and artistic, scientific or literary talent, are not thought less blameworthy for their criminal conduct by any significant segment of our society. See *Lewis v. State*, 815 S.W.2d 560 (Tex.Cr.App.1991). Rather, if society does regard such characteristics as mitigating, it must necessarily be because persons possessing them are thought to be more valuable than are those who do not, or somehow deserving of greater consideration on account of their important contributions. Whatever other social or political interest such a belief may serve, personal moral culpability plainly has nothing to do with this sense of mitigation.

Of course, it might be noticed that "dangerousness" is also irrelevant to culpability, even though a low probability of it has been held to have significant mitigating effect as a matter of constitutional law. See *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). Restricting one's understanding of "mitigation" only to that evidence which affects culpability would, therefore, draw the constitutional net too tightly. But, to the extent that evidence has a tendency to prove an accused less dangerous than other offenders, the jury is given full authority under Texas statutory law to express its judgment by answering the second special punishment issue negatively. See Art. 37.071(b)(2), V.A.C.C.P.

Unquestionably, further careful reading of constitutional precedent in this context also seems to imply that "culpability" and "dangerousness" are not the only mitigation criteria required by the Eighth Amendment. See *Franklin v. Lynaugh*, 487 U.S. 164, 186, 108 S.Ct. 2320, 2332–2333, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring). Certainly, I have no reason to suppose that the Supreme Court has come to the end of its mitigation exegesis. But neither have I any clear picture of the direction that exegesis is likely to take in the future. In my judgment, the Supreme Court has not yet provided a constitutional theory of mitigation sufficiently general in scope to enable application of it to

evidence which does not bear specifically on issues of culpability or dangerousness. Accordingly, it seems prudent under circumstances as they presently exist for this Court fully to effectuate the doctrine's current scope without extending it to regions as yet unexplored by the Constitution's highest court.

I do not mean by this that only evidence identical to that raised by Penry himself is within the ambit of existing constitutional law. As pointed out in *Gribble v. State*, 808 S.W.2d 65, 75 (Tex.Cr.App.1990), we accept the fact that,

> whenever a capital defendant produces evidence of his own character, background, or the circumstances surrounding his offense which, according to contemporary social standards, has a tendency to reduce his moral culpability in a way not exclusively related to the deliberateness of his criminal conduct, the provocative behavior of his victim, or the probability of his future dangerousness, the United States Constitution forbids imposition of the death penalty upon him by a sentencer given no means to prescribe, based on such mitigating evidence, a less severe punishment.

Clearly, mental retardation and childhood abuse are not the only circumstances which meet this test. But the test itself is the only one I would apply in Texas until further constitutional interpretation makes its modification necessary.

For this reason, the last category of evidence suggested by appellant seems to me the only plausible candidate for a claim that his personal moral culpability was at issue in a way not contemplated by the statutory punishment questions. When a child has been abused by his parents or by some other person in a position of trust or obligation toward him, he may have a greater tendency than normally reared children to develop an impaired conscience. In my experience, society does have an inclination to regard such persons as less blameworthy when, as adults, they offend social norms and standards. It also seems that society is willing to take this position irrespective of the probability that such offenders will continue, for the same

reasons, deliberately to commit criminal acts of violence in the future.

Had appellant produced sufficient evidence to raise the issue that his conscience was impaired because he was abused or betrayed as a child, and might therefore be somewhat less culpable for his criminal behavior as an adult, I would be inclined to hold that he could not be put to death consistently with prohibitions of the Eighth Amendment absent a jury instruction of the kind requested, or its functional equivalent. But, in spite of his protestations on appeal, appellant produced no such evidence at trial. I discern in the appellate record no implication that he was treated in any manner that could fairly be characterized as cruel, deceitful, or contemptuous. Instead, what he identifies in his brief as proof of abuse is really nothing more than evidence of a strictly rule-governed upbringing. Because I am unaware of any conspicuous belief among the American people that such an upbringing mitigates moral responsibility for mature misconduct, I cannot conclude that appellant's death sentence is offensive to the Eighth Amendment within the meaning of *Penry v. Lynaugh.*

I, therefore, concur in the judgment of the Court.

CLINTON, Judge, dissenting.

The majority opinion demonstrates two fundamental misunderstandings of the very case that prompted the Supreme Court of the United States summarily to remand this cause for our reconsideration, *viz: Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Because of its crabbed interpretation of *Penry*, the majority has yet to satisfy this mandate.

First, I fear the majority has not assimilated the basic holding in *Penry* that a capital jury must be empowered to effectuate any evidence that has mitigating potential that cannot be *fully* accommodated within the jury's response to special issues under Article 37.071(b), V.A.C.C.P. Early on the majority describes the Supreme Court's holding to be that proof of mental retardation and child abuse "constituted mitigating evidence that either was not relevant to the Texas special verdict issues or that had relevance to

the defendant's moral culpability beyond the scope of the special verdict questions." At 774. So far, so good. However, in coming to address the question whether the evidence proffered in mitigation in this cause necessitated the giving of one or more of his requested instructions, the majority tacitly assumes throughout that as long as it can identify some sense in which that evidence might be said to militate in favor of a "no" answer to one of the special issues, then it is not confronted with what it calls "*Penry* evidence." This assumption misses the very essence of the Supreme Court's holding. It may well be that the jury "had the opportunity to give effect" to a particular item of mitigating evidence within the parameters of special issues. E.g., at 775, 776 & 778.[1] But should that evidence also have some potentially mitigating aspect not accountable under the special issues, we cannot say that special issues enable the jury to give it *full* consideration and effect. The jury must be empowered to give mitigating evidence all the effect to which it is susceptible before we can say the Eighth Amendment has been satisfied, consonant with the holding in *Pen-*

ry.[2] To the extent it suggests otherwise, the majority opinion errs.

Secondly, as I understand it, the majority categorically rejects the view that evidence of appellant's voluntary service and kindness to others, his artistic and poetic talent, and his religious devotion can have any mitigating potential beyond the scope of special issues.[3] By and large, the majority believes such evidence evokes only a "sympathetic" or "emotional" response, not a "reasoned moral response." It is evident to me that a majority of the United States Supreme Court would disagree.

The Supreme Court has told us that "the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, at 304, 107 S.Ct. 1756, at 1773, 95 L.Ed.2d 262, at 286 (1987).[4] "[A]ny aspect of a defendant's character or record and any of the circumstances of the offense" that in reason could persuade a jury to impose a penalty less than death may be said in this context to be "relevant" mitigating evidence.[5] *Lockett v. Ohio*, 438 U.S. 586, at 604,

1. Telling in this context is the treatment of appellant's claim that evidence of his "artistic and poetic abilities" entitled him to the requested instruction. "Rather than to attempt to shoehorn" these "into the ambit of the second special issue," the majority simply announces these qualities of character have no mitigating significance whatsoever, either within the scope of special issues or otherwise. Slip. op. at 6. Again, this approach tacitly assumes that had the majority been able thus to "shoehorn" the proffered evidence, the analysis would end. The majority apparently continues to subscribe to the view that as long as some mitigating effect can be given within the special issues, the Eighth Amendment is satisfied. Distilled to its essence, this is precisely the view the Supreme Court put to rest in *Penry*.

2. Of course I do not mean to intimate that a jury must assess a penalty less than death in any case in which mitigating evidence going beyond the scope of special issues is presented. But where such evidence is presented jurors must not be precluded from assessing a penalty less than death by omission of a requested instruction that would empower them to do so.

3. I agree with the majority that appellant's evidence he claims establishes a history of family abuse cannot reasonably be construed to do so. On the other hand, evidence that he was "put

down" as one of a handful of black students in a predominantly white school, the admittedly nebulous testimony of the effect of the general racial turbulence during his school days, and evidence of a reading disability, all tend, at least, to show "a disadvantaged background," and to show appellant might certainly have cause for "emotional problems." *Penry v. Lynaugh*, 492 U.S. at 318–319, 109 S.Ct. at 2947, 106 L.Ed.2d at 278, quoting *California v. Brown*, 479 U.S. 538, at 545, 107 S.Ct. 837, at 841, 93 L.Ed.2d 934, at 942 (1987) (O'Connor, J., concurring). The majority concludes, *ipse dixit*, that evidence of name-calling and the effect of racial unrest has no bearing on his moral culpability. Similarly, the majority opines that evidence of a reading disability "does not reach the threshold that mandates a *Penry* instruction." Until the majority identifies where that "threshold" lies, however, such pronouncements carry more rhetorical than authoritative weight.

4. Emphasis here and throughout is in the original.

5. In truth, the concept of "relevancy" in this context seems odd to me. The only material issue, or "fact of consequence," is whether an accused found guilty of a capital crime deserves a sentence less than death. As is the case at the punishment phase of a non-capital prosecution,

98 S.Ct. 2954, at 2965, 57 L.Ed.2d 973, at 990 (1978) (Plurality opinion); *Eddings v. Oklahoma,* 455 U.S. 104, at 110, 102 S.Ct. 869, at 874, 71 L.Ed.2d 1, at 8 (1982).

> "Lockett and Eddings reflect the belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus, the sentence imposed should reflect a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion."

*California v. Brown,* 479 U.S. 538, at 545, 107 S.Ct. 837, at 841, 93 L.Ed.2d 934, at 942 (1987) (O'Connor, J., concurring). Evidence invoking a purely sympathetic or emotional response is probably not "relevant." See *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).

The majority describes evidence of appellant's relationship with Karen Cracken as nothing more than a "transparent" ploy for sympathy. It rejects outright any possibility that evidence of his artistic sensibilities could be a legitimate component of a jury's reasoned moral judgment whether to impose the death penalty. Nor does the majority itself "believe" his evidence of racial strife during his school years can inform that decision.[6] Finally, the majority opines that religious devotion is a consideration that is covered under the second special issue; apparently the majority believes it either has no other mitigating value, or need have no other mitigating value so long as the jury can give it some, albeit not *full,* mitigating effect.

Evidence precisely of this kind is not squarely covered in *Penry v. Lynaugh,* supra. Nevertheless, it is not plain to me that jurors would find these facets of appellant's

character insignificant in making the normative evaluation whether he deserves to live in spite of his crime. The Supreme Court has not expressly limited its view of "relevant" mitigating evidence to those circumstances necessarily bearing on personal culpability for the particular offense committed or those aspects of the defendant's background or makeup to which his crime may be, at least in part, attributable.[7] See *Skipper v. South Carolina,* 476 U.S. 1, at 4–5, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1, 7 (1986). To the contrary, there is every indication a majority of the Supreme Court believes "[e]vidence of voluntary service, kindness to others, or of religious devotion" to be relevant inasmuch as it "might demonstrate positive character traits that might mitigate against the death penalty." *Franklin v. Lynaugh,* 487 U.S. 164, at 186, 108 S.Ct. 2320, at 2333, 101 L.Ed.2d 155, at 173 (1988) (O'Connor, J., concurring). When the Supreme Court defines evidence as "relevant" for Eighth Amendment purposes, this Court is not at liberty to regard it otherwise.

Today's majority continues to resist the holdings in *Lockett, Eddings, Skipper,* and now *Penry v. Lynaugh,* supra, foxhole by foxhole, to the last bunker. See *Stewart v. State,* 686 S.W.2d 118 (Tex.Cr.App.1984) (Clinton, J., dissenting). Declining to join the latest skirmish, I respectfully dissent.

MALONEY, J., joins.

---

where the issue is simply "what punishment to assess," this is "a normative process, not intrinsically factbound." *Murphy v. State,* 777 S.W.2d 44, at 63 (Tex.Cr.App.1989) (Plurality opinion on State's motion for rehearing). That being the case, it seems to me that "what is 'relevant' to determining proper punishment is more a question of policy than of logic." *Id.* Because it is a question of Eighth Amendment proportions, however, that policy call is ultimately for the United States Supreme Court to make.

**6.** See n. 3, *ante.*

**7.** Certainly the probability—or, for that matter, the improbability—that a *capital defendant* would commit future acts of violence that would constitute a continuing threat to society is not a question bearing on his personal culpability for the particular offense on trial. Yet we know that our second special issue provides at least a partial mechanism for jury consideration of what is, in contemplation of the Supreme Court, relevant "mitigating" evidence under the Eighth Amendment. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).