IN THE COURT OF CRIMINAL APPEALS


OF TEXAS







AP-73,775






EX PARTE GABRIEL GONZALES, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM BEXAR COUNTY






 Womack, J., delivered the opinion of the Court, in which Meyers, Price,
Johnson, Holcomb, and Cochran JJ., joined. Cochran J., filed a concurring
opinion. Keller, P.J., filed a dissenting opinion. Keasler, J., dissented. Hervey,
J., did not participate.



 This is a post-conviction application for a writ of habeas corpus filed pursuant to Code of
Criminal Procedure article 11.071. On July 20, 1994, the applicant and four other members of the
"Crips" gang committed robbery at a pawn shop to get firearms and money. Only the applicant
and one other suspect were armed with guns. While his accomplices were smashing display cases
and stealing guns, the applicant chased one of the proprietors of the shop into the back of the
store and shot her. Then he returned to the cash register and forced an employee to open it. (1) On
February 19, 1997, he was convicted of capital murder and sentenced to death. We affirmed his
conviction on direct appeal. (2)

 In his writ application, the applicant presents six "claims" for relief. After a hearing, the
convicting court made findings of fact and conclusions of law, and it recommended that relief be
denied. As to five of the claims, we agree that relief should be denied in accordance with the
findings and conclusions of the convicting court. We set this case for consideration of the
applicant's claim that his trial counsel provided ineffective assistance under the Sixth
Amendment by failing to present, at the punishment phase of his trial, mitigating evidence of the
abuse that the applicant suffered at the hands of his father, and the effects it had on him.

 To show that his trial counsel was ineffective, the applicant must meet the two-pronged
test articulated in Strickland v. Washington. (3) First, he must show that his counsel's performance
was deficient. (4) In order to satisfy this prong, the applicant must demonstrate that counsel's
performance fell below an objective standard of reasonableness, considering the facts of the
particular case and judged at the time of counsel's conduct. (5) Second, the applicant must show
that counsel's performance prejudiced his defense at trial. (6) In order to satisfy this prong, an
applicant must show there was a reasonable probability that, absent the errors, the jury would
have concluded that the balance of the aggravating and mitigating circumstances did not warrant
death. (7) Texas' capital sentencing scheme does not involve the direct balancing of aggravating
and mitigating circumstances. It asks the jury to answer a mitigation issue. (8) We have adapted the
Supreme Court's prejudice test to require a showing that there is a reasonable probability that,
absent the errors, the jury would have answered the mitigation issue differently. (9) "A reasonable
probability is a probability sufficient to undermine confidence in the outcome." (10)

Counsel's Performance


 The applicant alleges, and the convicting court found as a matter of fact, that his father
physically and sexually abused him severely and frequently when he was a small child. As a
result, he suffers from a post-traumatic stress disorder. (11) None of these facts were put in evidence
at his trial. (12)

 The applicant's father also abused the applicant's older sister, who eventually reported it
to her mother. The applicant's mother had thought that her husband was sexually abnormal, and
that he used excessive force with the children. When her daughter reported being sexually
abused, she immediately notified the police and obtained a divorce. (13)

 The defense attorney talked to the mother once before trial, and to the sister once during
trial. (14) He did not ask them or the applicant about any specific topics such as abuse in the
applicant's past. (15) His interviews with the mother and sister started "globally in nature," but he
"never even dreamed" of the issue of abuse, and he "certainly didn't really inquire about it." (16) He
did ask the applicant about how he grew up."I just start from the beginning, you know, tell me all
about you. Where were you born and so forth, leading them up to -- to this time." (17) The
applicant did not volunteer any information about abuse. (18) The sister testified at the habeas
hearing that she did not volunteer information about the abuse because she is ashamed of having
been abused and it is not very easy to talk about. (19)

 The applicant's counsel had tried "quite a few capital cases," and his experience was that
evidence of a young defendant's background would have been very helpful in trying to get a life
sentence instead of a death sentence. In retrospect, he said, "I really should have pursued this or
at least inquired into it, but I did not." (20) His failure to do so was not a strategic or tactical
decision, and he believes it was a mistake on his part. (21) 

 The sister did testify at the punishment stage of the trial that the applicant was bullied in
school, that he had trouble learning, and that he had been diagnosed as being "borderline
retarded" and suffering from epilepsy (as did his father) and attention-deficit disorder. (22) The
applicant's mother was not called to testify. (23)

 After the trial and before the habeas hearing, a board-certified psychiatrist interviewed the
applicant and examined his school records and jail records. His diagnoses were that the applicant
suffers from chronic post-traumatic stress disorder, attention-deficit disorder with hyperactivity,
mixed personality disorder with explosive and antisocial traits, hereditary epilepsy, dyslexia and
other learning disorders. (24) The psychiatrist's version of the applicant's history says:

 "From that point [of his parents' divorce] on, Gabriel had extreme homophobic
reactions, especially any insinuation that he was "Gay" or if he was called "Gay,"
he reacted in a very agitated manner. It was this trigger that caused him to exhibit
run-a-way [sic] behavior and exhibit "macho" behavior and run the streets. He
lived twenty-four hours a day in terror that he would be labeled "gay." (25)


 The psychiatrist's "psychodynamic formulation" included his opinion that:

 This is an individual who at an early age had [neurological and learning
disorders]. He also had stigmata of Post Traumatic Stress Disorder as a result of
extensive sexual abuse and molestation by his genetic father. He apparently was
threatened with homicidal intention, by the perpetrator, if he revealed to his
mother that this behavior was going on.

 This individual also has a Borderline Normal Intelligence Quotient which
would lead to poor processing of information and probably lower level of control
of behaviors which included antisocial behaviors and impulsive behaviors at an
early age. There was extensive drug abuse at an early age which extended into
adult age with participation in buying and selling drugs.

 This is an individual who has received many educational services,
marginal psychiatric services as a child, and evolved into a very impulsive, angry
adult whose trust was destroyed because of sexual molestation as a child. He,
therefore, was not able to evolve deep interpersonal relationships that are so
important for someone to learn to control and monitor his own behavior so that he
was able to function in a job as a normal productive citizen.

 This individual would require extensive psychiatric treatment for Post
Traumatic Stress Disorder and Chemical Dependence in order to be rehabilitated
in to [sic] a law-abiding, productive member of society." (26)


 Because trial counsel was not aware, at the time of trial, that the applicant suffered an
abusive childhood, the issue is not whether he was ineffective for failing to present evidence of
abuse, but rather whether he failed to conduct a reasonable investigation to uncover mitigating
evidence. (27) Or, more directly, was the applicant's trial counsel ineffective for failing to ask the
applicant --or his mother or sister -- if he was abused as a child?

 The trial court accepted as true the applicant's account of the abuse, that the applicant's
mother and sister were aware of the abuse, and that trial counsel did not ask specific questions
about it.

 The trial court noted that trial counsel was of the opinion that he made a mistake, and not
a strategic choice, in failing to ask the applicant and his family about abuse. The trial court was
not persuaded, however, that defense counsel conducted an unreasonable investigation because
"this information was all known to Applicant, who was legally competent to stand trial, and he
made no mention of it to his trial counsel." (28)

 Defense counsel's failure to investigate the basis of his client's mitigation defense can
amount to ineffective assistance of counsel. (29) In determining whether counsel conducted a
reasonable investigation, an appellate court's initial inquiry is whether a reasonable investigation
should have uncovered the mitigating evidence. (30)

 The Supreme Court held in 1989 that the application of Texas' capital sentencing statute
was in violation of the Cruel and Unusual Punishments Clause because "the jury was not
provided with a vehicle for expressing its reasoned moral response to  evidence [of a capital
defendant's mental retardation] in rendering its sentencing decision." (31) Thereafter, many
defendants who had been sentenced to death without such a "vehicle" raised such claims. Many
of the claims failed because the mitigating evidence could have been given effect under the
statute, or because there was no evidence of a nexus between the evidence and the commission of
the offense. (32)

 In other cases, we found a violation of the Eighth Amendment. These included a case in
which a defendant presented evidence of sociopathic personality brought on by childhood
abuse, (33) and a case in which there was evidence of a defendant's low IQ, poverty and parental
mistreatment. (34)

 In 1991, the statute was amended to comprise a much broader range of mitigating
evidence, namely, "all of the evidence, including the circumstances of the offense, the
defendant's character and background, and the personal moral culpability of the defendant." (35)

 These developments in constitutional and statutory law have made it necessary to
consider mitigating evidence in preparation for the trial of a capital case. Such evidence could
include the circumstances of the defendant's childhood and his physical and mental health. We
think that, at the time of the applicant's trial, an objective standard of reasonable performance for
defense counsel in a capital case would have required counsel to inquire whether the defendant
had been abused as a child. Counsel's performance fell below this standard.

Prejudice


 Having established that the performance of the applicants trial counsel fell below
reasonable standards, the applicant also must demonstrate that his counsel's performance
prejudiced his defense, in order to establish a Sixth Amendment violation. (36) Under Strickland, an
applicant must show that there is a reasonable probability that, but for counsel's unprofessional
errors, the result of the proceeding would have been different. (37) A reasonable probability is a
probability sufficient to undermine confidence in the outcome. (38) In cases such as the one at hand,
where there is no lower court decision with regard to prejudice, we will ourselves evaluate the
evidence in aggravation and the available mitigating evidence, in order to determine how a jury
might reasonably answer the mitigation special issue. (39) In doing so, we consider the totality of the
evidence, "both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." (40)

 The aggravating evidence presented by the State at the original punishment hearing can
be divided into three general categories. The first category was a recitation of the applicant's
prior offenses, including a 1991 conviction for criminal trespass, convictions in 1993 for burglary
of a vehicle and unlawful carrying of a weapon, an arrest in 1993 for possession of cocaine and
possession of marijuana, and his apparent involvement in a 1993 pawn shop robbery with similar
characteristics to the robbery in this case. The State also proved that the applicant had violated
the terms of his probation by absconding from a court-ordered drug treatment facility. The
second category was evidence of the applicant's various disciplinary infractions while residing in
Bexar County detention facilities. Finally, the third category of aggravating evidence involved
witnesses called to testify to the existence and nature of gang activity in Texas prisons. Through
these witnesses' testimony, the State argued that the applicant's affiliation with the Crips would
allow him to continue committing criminal and potentially violent acts even while incarcerated.
The State bolstered this point by showing the jury a letter that the applicant had written from his
jail cell to a fellow Crip, in which the applicant offers to murder rivals on behalf of the letter's
recipient once he gets to prison. In total, the State called nineteen witnesses during its
punishment case-in-chief.

 In his own punishment case-in-chief, the applicant called one witness: his sister, Demeris
Gonzalez. Gonzalez testified that, in school, the applicant was always "a slow learner" who was
often placed in special education classes. She said that he was often bullied because he was a
small child, and that he was always more of a follower than a leader. She said that he was
diagnosed with epilepsy, attention deficit disorder, and clinical depression. She said that their
family situation was difficult because the family moved several times, and because of their
parents' marital problems. She testified that both she and the applicant dropped out of high
school before graduating, in his case because he had difficulties at school and because he was
tired of being bullied. She said their parents divorced after their father had started to become
physically abusive towards their mother, and that the applicant attempted to live with his father
but that his father rejected him. Gonzalez also testified that the applicant became involved with
gangs at the age of eighteen, after being initiated simultaneously with their younger brother. She
said that the applicant often expressed a desire to leave the gang, beginning about three months
after he first joined when he realized the things the gang was doing, but that he was too scared to
do so. 

 In argument, the State spoke of the applicant's prior offenses and stressed the likelihood
that the applicant would continue his criminal gang activity while in prison. The State also
suggested the applicant lacked remorse, as shown by the statement he reportedly made
immediately after the crime at hand: "I smoked that white bitch." Finally, the State noted that the
applicant's mitigation evidence consisted only of his sister's testimony, who understandably
would be quite sympathetic to him.

 The applicant's argument reiterated his sister's testimony, and attacked a few points made
by the State's witnesses. The applicant also pointed out that two of his accomplices, who testified
against him at trial, themselves received life sentences for participating in the same criminal
transaction for which he had been convicted. Additionally, the applicant recalled firearm expert
testimony from the guilt-innocence phase of trial that called into question whether the applicant
actually could have shot the victim in this case.

 The evidence and arguments at the punishment hearing would have been significantly
different with the mitigating evidence adduced at the applicant's habeas hearing. The habeas
court accepted as true that the applicant's father forced him to perform oral sex on him weekly
beginning when the applicant was less than six years old, and that his father had anal intercourse
with the applicant weekly from the time he was seven years old. The applicant's father was also
physically abusive towards the applicant if he resisted, and would threaten to kill the applicant, as
well as the applicant's mother, if the applicant ever told anyone about the abuse. The applicant's
father also sexually molested the applicant's sister numerous times during her childhood. It is not
clear from the record when the abuse ended, but the applicant lived with his father until his
parents divorced in 1988, when the applicant was fourteen years old.

 The habeas court accepted as true the conclusions of Dr. Raymond D. Potterf, a board-certified psychiatrist who examined the applicant and diagnosed him as suffering from Post-Traumatic Stress Disorder due to the repeated physical and sexual abuse he suffered. Dr. Potterf
also concluded that the applicant had a "Borderline Normal Intelligence Quotient which would
lead to poor processing of information and probably lower level of control of behaviors which
included antisocial behaviors and impulsive behaviors at an early age." (41) The habeas court
accepted Dr. Potterf's conclusion that, if given extensive psychiatric treatment for Post-Traumatic Stress Disorder and Chemical Dependence, the applicant could perhaps become a
productive, law abiding member of society. (42) None of this evidence was presented during the
applicant's trial.

 We believe the mitigating evidence presented at the habeas hearing is substantially
greater and more compelling than that actually presented by the applicant at his trial. We cannot
say with confidence that the facts of the capital murder and the aggravating evidence originally
presented by the State would clearly outweigh the totality of the applicant's mitigating evidence
if a jury had the opportunity to evaluate it again. In short, we conclude that the applicant's
available mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal"
of the applicant's moral culpability. (43) Therefore, there is at least a reasonable probability that, had
this mitigating evidence been available at the applicant's original punishment hearing, a different
result would have occurred, such that it undermines our confidence in the outcome.

Conclusion

 The application for relief from the punishment portion of the judgment is granted. The
applicant is remanded to the trial court for a new punishment hearing or other proceedings
consistent with this opinion.


Delivered October 18, 2006.

Publish.
1. See Gonzales v. State, No. 72,804 (Tex. Cr. App. September 16, 1998) (not designated for
publication), at 3-4.
2. See id.
3. 466 U.S. 668 (1984).
4. See id., at 687.
5. See id., at 688, 690.
6. See id., at 692.
7. See id., at 695.
8. "Whether, taking into consideration all of the evidence, including the circumstances of the
offense, the defendant's character and background, and the personal moral culpability of the defendant,
there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life
imprisonment rather than a death sentence be imposed." Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).
9. Where a defendant challenges his death sentence on the ground of ineffective assistance of
counsel at the punishment phase, the Supreme Court's test for prejudice is whether there is a reasonable
probability that, absent the errors, the jury would have concluded that the balance of the aggravating and
mitigating circumstances did not warrant death. See Strickland, 466 U.S., at 695. We have adjusted this
test to accommodate the Texas capital sentencing scheme, which does not involve the direct balancing of
aggravating and mitigating circumstances. See Ex parte Davis, 866 S.W.2d 234, 239 (Tex. Cr. App.
1993).
10. Strickland, 466 U.S., at 694.
11. Trial Court's Findings of Fact and Conclusions of Law, Clerk's Record [hereinafter "CR"]
176, 197.
12. Id., at 198.
13. Id., at 99-103.
14. Id., at 199, 200.
15. Id., at 199-200.
16. Reporter's Record [hereinafter "RR"], at 77.
17. Id., at 76.
18. Trial Court's Findings of Fact, CR, at 202.
19. RR, at 111.
20. Id., at 78.
21. Trial Court's Findings of Fact, CR, at 201.
22. Id., at 198.
23. RR, at 103.
24. Application, Exhibit K, at 6 (CR, at 106).
25. Id., at 5 (CR, at 105).
26. Id., at 7 (CR , at 107).
27. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that
makes particular investigations unnecessary." Strickland, 466 U.S., at 691.
28. Trial Court's Conclusion of Law, CR, at 208.
29. See Williams v. Taylor, 529 U.S. 362, 395-97 (2000) (reaffirming state trial court's decision to
grant new sentencing trial on ground that counsel provided ineffective assistance by failing to uncover
certain mitigating evidence).
30. See Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir. 1995).
31. Penry v. Lynaugh, 492 U.S. 302, 328 (1989).
32. See, e.g., Richardson v. State, 879 S.W.2d 874 (Tex. Cr. App. 1993) (mother in and out of
penal institutions, never knew father, raised in poverty with little supervision, sometimes went hungry,
sometimes stole food, went to state institutions for children, illiterate, stuttered, slow learner); Chambers
v. State, 866 S.W.2d 9 (Tex. Cr. App. 1993) (father never home, father blew marihuana smoke in face,
violence toward women at home, mother remarried, dropped out of school, attempted suicide, denied
assistance by MHMR, almost froze, never been convicted of felony); Elliott v. State, 858 S.W.2d 478
(Tex. Cr. App. 1993) (dropped out of school, raised by single parent in housing project, behaved well in
jail, had religious conversion); Zimmerman v. State, 860 S.W.2d 89 (Tex. Cr. App. 1993) (twice
abandoned as child, some child abuse, good to mom, metal plate in skull, low-average IQ, paranoid
personality); Gunter v. State, 858 S.W.2d 430 (Tex. Cr. App. 1993) (age 20, abandoned by mother,
adopted by strict parents, emotional and behavioral problems, hearing impairment, learning disorder);
Satterwhite v. State, 858 S.W.2d 412 (Tex. Cr. App. 1993) (inadequate parenting, father absent, mother
alcoholic, poverty, IQ of 74); Ex parte Kunkle, 852 S.W.2d 499 (Tex. Cr. App. 1993) (youth, use of
drugs and alcohol at time of crime, depressed parents, and expulsion from home); Muniz v. State, 851
S.W.2d 238 (Tex. Cr. App. 1993) (raised in poverty by single parent, religious, generous and loving,
good son and brother, involved in church activities, and had developed artistic abilities); Johnson v.
State, 853 S.W.2d 527 (Tex. Cr. App. 1992) (absence of violent behavior, record of hard work, an
impeachment of State's expert witness of future dangerousness); Ex parte Baldree, 810 S.W.2d 213
(Tex. Cr. App. 1991); Black v. State, 816 S.W.2d 350 (Tex. Cr. App. 1991),(good employee, boy scout
leader, good child, helpful adult, veteran); Ex parte Bower, 823 S.W.2d 284 (Tex. Cr. App. 1991) (good
and non-violent character, good deeds, no criminal record); Boyd v. State, 811 S.W.2d 105 (Tex. Cr.
App. 1991) (good work record, weeping when arrested, polite and helpful, respectful, helped his sister,
considerate to girlfriend and child, had a stepfather, took care of his mom); Ex parte Ellis, 810 S.W.2d
208 (Tex. Cr. App. 1991) (drug problem, suicide attempt, lack of education, close family ties); Lackey v.
State, 816 S.W.2d 392 (Tex. Cr. App. 1991) (low IQ, troubled childhood, age 23, voluntary intoxication,
and history of periodic drinking with blackouts); Richardson v. State, 886 S.W.2d 769 (Tex. Cr. App.
1991) (voluntary service and kindness to others, artistic and poetic talent, strict discipline by father,
difficulty in learning to read, racial strife in childhood, religious devotion); Lewis v. State, 815 S.W.2d
560 (Tex. Cr. App. 1991) (unhappy childhood); Boggess v. State, 855 S.W.2d 645 (Tex. Cr. App. 1991)
(vision problems in childhood).
33. Richard v. State, 842 S.W.2d 279 (Tex. Cr. App. 1992)
34. Ramirez v. State, 815 S.W.2d 636 (Tex. Cr. App. 1991).
35. Act of June 16, 1991, 72d Leg., R.S., ch. 838, § 1, 1991 Tex. Gen. Laws 2898, 2899, now
codified as Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).
36. Strickland, 466 U.S., at 692.
37. Id., at 694.
38. Ibid.
39. See Wiggins v. Smith, 539 U.S. 510, 534 (2003).
40. Id., at 536 (quoting Williams v. Taylor, 529 U.S. 362, 397-98 (1999)).
41. Application, Exhibit K, at 7 (CR, at 107).
42. Trial Court's Findings of Fact, CR, at 198.
43. Wiggins, 539 U.S., at 538 (quoting Williams, 529 U.S., at 398).