Ryan Christopher WHITE, Petitioner,

v.

Domingo URIBE, Warden, Respondent.

Case No. CV 10–5983–JFW (SP).

United States District Court,
C.D. California.

Sept. 7, 2012.

Ryan Christopher White, Corcoran, CA, pro se.

Sarah Jean Farhat, CAAG–Office of the Attorney General, California Department of Justice, Los Angeles, CA, for Respondent.

## ORDER ACCEPTING FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

JOHN F. WALTER, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, records on file, and the Report and Recommendation of the United States Magistrate Judge. Petitioner has not filed any written Objections to the Report within the time permitted. The Court accepts the findings and recommendation of the Magistrate Judge.

IT IS THEREFORE ORDERED that Judgment will be entered denying the Petition and dismissing this action with prejudice.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

SHERI PYM, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable John F. Walter, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 05–07 of the United States District Court for the Central District of California.

### I.

### *INTRODUCTION*

On August 11, 2010, petitioner Ryan Christopher White, a California prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus ("Petition") challenging his 2007 state court convictions by a jury for attempted murder and assault, with hate crime allegations found true. Petitioner contends that the trial court violated his rights to a fair trial and impartial jury

by granting the prosecution's *Batson/Wheeler* motion, and thereby denying a defense peremptory challenge and allowing the challenged juror to remain seated. Pet. at 5(A)–5(C); *see Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), *overruled on other grounds by Johnson v. California,* 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005).

Because the Supreme Court has clearly held that even the mistaken denial of a peremptory challenge does not violate the federal Constitution, petitioner's claim is *Teague*-barred (*see Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)), and does not afford a basis for federal habeas relief. Moreover, even if construed as a claim that he was deprived of his right to an impartial jury, petitioner's claim fails on its merits. Accordingly, the Petition should be denied.

### II.

### *BACKGROUND*

#### A. *Statement of Facts*

The court adopts and incorporates by reference the recitation of facts concerning the crimes of conviction set forth in the December 3, 2009 opinion of the California Court of Appeal, which this court finds contains an accurate summary based on its review of the record. *See* Lodg. No. 6 at 3–11; *see also* 28 U.S.C. § 2254(e)(1) (facts presumed correct). A synopsis of some of these facts, taken from the evidence presented by the prosecution, follows.[1]

On December 8, 2006, Charles Washington and Kavis Knight, who are both Afri-

---

1. Because sufficiency of the evidence is not an issue raised in this Petition, many of the facts presented in the Court of Appeal's opinion—including the evidence presented by the defense—have been omitted. Instead, principal-ly included here are facts presented by the prosecution to prove the offenses were hate crimes, as this is relevant to the jury selection claim raised in the Petition.

can American, went to a liquor store in Claremont at approximately 7:30 p.m. The liquor store was located in a small shopping center with a Baker's Square restaurant. Knight left the store first and went outside. When Washington went outside approximately a minute later he saw Knight and a group of approximately seven white men surrounding him. Washington heard a lot of arguing and yelling. To Washington, the men appeared to be skinheads because of their shaven heads, red suspenders, and construction-type boots. More persons Washington believed to be skinheads came out of the Baker's Square restaurant and approached them. Washington heard someone shout, "We're going to kill some niggers tonight."

One of the men, whom Washington identified in court as petitioner's codefendant Anthony Scott Allen, kicked Knight in the leg. Washington remembered co-defendant Joseph Dale McCool being present, but he could not identify petitioner. After kicking Knight, Allen confronted Washington, and Washington thought Allen was going to throw a punch. Washington fell down and was kicked. Washington curled up in the fetal position while he was kicked all over his body, including in the head and back. As he was being stomped, someone in the group began stabbing him, and he was stabbed six times.

Knight said that when he left the liquor store he was approached by a white male who was gesturing to him. He identified this male as Allen. Allen began saying things about "White pride." They began a verbal racial exchange. At that point, Washington came out of the store and asked what was going on. Other men came and formed around them. The men were wearing suspenders, big boots, and items that stood for "White pride."

Knight identified McCool as being present. Knight laughed at the Hitler pin McCool was wearing, and McCool kicked

Knight in the leg. About eight more people came out of Baker's Square and it became more intense. Knight heard someone say, "We gonna kill us a nigger tonight."

One of the men tried to rush Knight, and Knight began swinging. Knight saw that Washington fell and "was swarmed." Washington was being kicked "real bad." Knight saw McCool as the last person to leave Washington, and he saw him down on one knee. He believed McCool stabbed Washington.

Eric Kraus is a parole agent with the California Department of Corrections who investigates cases involving white supremacist groups, or skinheads. He testified as an expert on these groups. Skinheads wear lace-up boots with red or white laces and suspenders that are usually red or white. They wear polo shirts and bomber jackets that often display pins and flags that reflect their ideology.

Skinheads often have tattoos, and the most popular tattoo they acquire is a swastika. Next in popularity are the numbers 14 and 88. The number "14" refers to 14 words taken from a white supremacist essay. The number "88" refers to the eighth letter of alphabet, "H," and thus to the words "Heil Hitler," and also to a white supremacist manifesto, "The 88 Precepts."

Kraus identified a photograph of petitioner, shirtless, which showed a swastika tattoo in the middle of his chest. Among other tattoos, petitioner had one of the sole of a boot on his inner arm, the number 14, the number 88, and a death head, or "totenkopf," which was a symbol of the German military division that ran the concentration camps. Kraus identified a Nazi flag and t-shirts with skinhead symbology and words on them that were found in petitioner's home.

Kraus also identified similar white supremacist tattoos and other items for McCool and Allen. Kraus described a white supremacist group known as "The Order," and said that in December 2006 there was a scheduled rally at the federal courthouse in the Westwood area of Los Angeles to demonstrate on behalf of Order members.

Chad Milson was good friends with McCool and had met petitioner and Allen a year before the rally. On December 8, 2006, Milson and several others gathered at petitioner's house in Joshua Tree. They were going to drive to San Fernando, meet other people, and go to the Free the Order march on December 9, 2006. They all set off in three vehicles.

Milson drove some of them in his truck, including Allen and petitioner. All three vehicles stopped at a Baker's Square in Claremont so that people could use the bathroom. Milson saw Allen approach the liquor store and begin talking with Knight, and then saw the men who had gone into Baker's Square come out and walk over to Allen and Knight. Washington came out and joined Knight.

After further posturing, Washington and one of the men squared off to fight, and Allen and Knight squared off to fight. As the two pairs of fighters danced around and got a feel for each other, petitioner returned to Milson's truck and grabbed a knife from the backseat.

Milson stopped watching for some period of time, and when he turned back, Washington was on the ground being kicked, and Knight was in front of the liquor store. Milson's traveling companions then ran up and piled into the vehicles. Allen and petitioner were in Milson's truck, and everyone was "freaking out." Petitioner said he stabbed someone twice, and he sounded rather scared. When he asked what he should do with the knife, no one answered. Milson believed petitioner tossed the knife out the window because he heard a metallic sound. They continued on to San Fernando as planned and stayed overnight.

The next day they all went to the march. At the parking structure in Westwood, police officers lined them all up and arrested some of them.

Dorian Logue stopped by Baker's Square on the evening of December 8, 2006. He saw some men squaring off to fight and a group forming. He saw more people joining the group and realized they were in attire "suited for an Aryan nation type group of people." Logue heard slurs being shouted, such as "f'ing nigger" and either "I'm going to show you my power" or "I'm going to show you White power." He also heard "NLR" or "Nazi Low Rider." Logue saw Washington fall down after he was hit in the back of the head or shoulder by one of the men. The men began kicking and hitting Washington, and one man shoved a knife in him. After the men ran away, Logue approached Washington and saw he was unconscious and bleeding badly from the buttocks, leg area, and the back.

A Claremont Police Department officer arrived on the scene and recovered a black t-shirt bearing the words, "Storm Troop 16" and a swastika and eagle emblem. He also found a knife with a five-inch blade in the center median in the direction the men had fled the scene. Blood on the knife was later found to be Washington's.

## B. *Voir Dire Proceedings*

The court adopts, with a few minor modifications, the recitation of voir dire proceedings set forth in the Court of Appeal's opinion, which the court finds to be an accurate summary. *See* Lodg. No. 6 at 12–16. This summary is as follows.

In response to the standard voir dire questions, Juror No. 17 said she lived in San Dimas and was single with no children. She was a retired clinical laboratory technologist and had served twice on juries, one civil and one criminal (murder). Both juries had reached verdicts. She had no family or friends in law enforcement and had no concerns.

The trial court asked whether any jurors had concerns about their ability to apply the presumption of innocence, and "two gentlemen" raised their hands. The trial court asked if any jurors had concerns about being able to be fair and objective, and Jurors Nos. 11 and 14 raised their hands. Juror No. 11 said she was an African–American female and did not know if she could be fair. Juror No. 14 said he had experienced a confrontation with skinheads in Washington, D.C. The trial court asked for a show of hands from anyone who had heard about the incident and Jurors Nos. 6, 11, 12, 13, 14, and 17 (the juror at issue) raised their hands. When the trial court asked if any of the jurors remembered more information than what the court had already discussed, there was no response. The trial court asked each juror to relate their reaction when they heard that the case involved a hate crime allegation. Juror No. 17 said, "It was disturbing, but people have a right to their thoughts. But when they take those thoughts to a physical, that's why we have the court system and that's why we're here." When given the opportunity to ask questions to certain jurors, none of the three defense lawyers questioned Juror No. 17.

The defense challenges for cause were heard, and Juror No. 17 was not challenged by the defense. When given the opportunity for the first peremptory challenge, the prosecutor accepted the jury as constituted. The defense exercised several peremptories, including one for Juror No. 9, who was replaced by the juror at issue in this case.[2] The trial court then turned to the jurors who were outside the box and asked the standard questions. Afterward, several jurors were dismissed for cause and the peremptories began again.

Co-defendant Allen's counsel, Gary Meastas, exercised a peremptory challenge to Juror No. 17, who is African–American, and the prosecutor asked to approach. Meastas later told the court it was a joint challenge for which he was the spokesperson. At sidebar the prosecutor stated, "There may be a good reason to throw this juror off, but I don't know what it is." Meastas replied that he had picked lots of jurors but had heard very few say they were disgusted about the charge. Also, the juror had read prior accounts of the case. Most of the jurors had no knowledge whatsoever, but she did. Co-defendant McCool's counsel, Pamela Tedeschi, said that the juror used the word "disturbing" when asked about the "N" word. She said the juror was not forthright and did not offer anything more when Tedeschi gave her an opportunity to explain it. Petitioner's counsel, Rudolfo Aguirre, concurred with his fellow defense attorneys.

The prosecutor responded that "the reaction of disturbing or disgusted is reasonable in this case. The charges are disturbing and I don't see anything abnormal about that at all. She didn't say that she remembered anything or prejudiced her or impacted her [sic]. There's nothing wrong with somebody having perhaps heard something about the case."

The trial court stated, "There was nobody in the courtroom who indicated that they read or recalled anything about this

**2.** Although Juror No. 17 became Juror No. 9, the court continues to refer to the juror at issue as Juror No. 17, just as the parties did in their briefs.

case that was different that I had related to them here in court. I don't believe that is a sufficient basis. I don't believe that having read something about this case was of no more detail than what I exposed is a basis for a challenge for cause. I think, also, that if someone characterizes the things that you have talked about and the specific views of an offensive word as disgusting, that can't be a basis for it either because then the expected response would be approval. I'm going to find that there's been an adequate showing that the challenge has not been race neutral."

Meastas asked the court to review Juror No. 17's response in light of what the other jurors said. He insisted that Juror No. 17 had one of the strongest responses. The trial court stated, "And the reason for that probably has something to do with her race because someone who has had that word used about them who is not a member of that group I would think would not be as affected as an individual who is a part of that group." The trial court found an improper exercise of peremptory challenge and noted that the case authority authorized the quashing of the panel or another remedy. The prosecutor stated he did not want the trial court to quash the panel, and the trial court seated Juror No. 17.

On the following day, the trial court stated it had reviewed the prior day's proceedings and had found, from a totality of the circumstances, that a reasonable inference had arisen that the basis of the joint peremptory challenge was Juror No. 17's race. The trial court reiterated counsel's reasons for the challenge: that the juror had some prior information about the event as a result of media coverage, and that she characterized the hate crime or the use of the "N" word as disgusting. The trial court noted that, once several jurors had identified themselves as having read about the case, Juror No. 17 was not

asked any further questions about the pretrial media information. In addition, Juror No. 8, who was still in the box, also indicated disgust with the hate crime and use of the "N" word. She said the word had no purpose and she did not like it. And there were no follow-up questions by any counsel to Juror No. 17 about her characterization of disgust toward that word. Juror No. 17 did not raise her hand when the group was asked if anyone was affected by the nature of the charge and the allegation to the degree that they could not be fair and objective. Nor did she raise her hand when the trial court asked if there was anyone who had concerns about being able to abide by the presumption of innocence. Also, Juror No. 17 did not indicate to the court that she had any recollection of media information over and above what the trial court had revealed during voir dire. The court had not given the attorneys a time limit for questioning, yet "virtually no questions were directed to this juror specifically or did any of her responses to group questions raise any other areas of concern."

Tedeschi stated that Juror No. 8 was one of the first who was excused (and thus was not still in the box as the trial court had stated). Juror No. 8 was an Hispanic female who said she was disgusted and saw no purpose of it, meaning hate towards another race. Tedeschi pointed out that Juror No. 17 said it was disturbing but people have a right to their thoughts. Tedeschi believed the juror was very inconsistent. This inconsistency seemed to show an implied bias that the juror was not admitting for whatever reason, and the defense did not believe the juror could "hold both those thoughts on balance." The juror's unwillingness to share anything further was also inconsistent in Tedeschi's view. In addition, "she seems to have—I won't say she's staring in a menacing way, and she does stare, and it may

be my seating position because I'm directly across from her, but I just find her very contained, almost like she's controlling not to respond. That concerns me as well. Other jurors at least will have a facial expression or raised eyebrow. They'll shift in their chairs. She's sitting there rigidly."

Aguirre told the court that counsel believed the publicity issue to be a sensitive one, and noted that five other jurors were removed in part for that reason. Counsel believed it was dangerous, and that a juror with prior knowledge could eventually taint the remaining jurors. The trial court replied that Juror No. 4 had also said he or she had been exposed to publicity, and that juror was still on the panel. Meastas said that he had notes about some of the people the court had said were still on the panel despite their responses, and he said he had planned to remove them from the jury. The court stated it was aware that juror selection was not over, and it had based its decision on what had already occurred. The trial court cited *People v. Gray*, 87 Cal.App.4th 781, 104 Cal.Rptr.2d 848 (2001), for the proposition that a trial court can find an improper exclusion of jurors based on group bias even if only one person from that juror's group is excused. Voir dire then continued.

## C. *Procedural History*

On December 21, 2007, a jury found petitioner guilty of attempted murder (Cal. Penal Code §§ 664, 187(a)), and assault by means likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)). Clerk's Transcript ("CT") at 549–50, 653. The jury found true the allegations that: (1) the offenses are hate crimes voluntarily committed in concert with others (Cal. Penal Code § 422.75(b)); and (2) petitioner personally used a deadly and dangerous weapon in the commission of the offenses (Cal. Penal Code § 1192.7(23)). CT at 549–50. On April 8, 2008, the trial court

sentenced petitioner to thirteen years in state prison. CT at 647–49, 653–54.

On December 3, 2009, the California Court of Appeal affirmed the trial court's judgment in a reasoned, unpublished opinion. Lodg. No. 6 at 1, 26. Thereafter, petitioner filed a petition for review in the California Supreme Court, which was denied without comment on March 10, 2010. Lodg. Nos. 7, 8.

## III.

### *LEGAL STANDARDS*

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that federal habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

In assessing whether a state court "unreasonably applied" Supreme Court law or "unreasonably determined" the facts, the federal court looks to the last reasoned state court decision as the basis for the state court's justification. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir.2004). Here, the California Court of Appeal's opinion on December 3, 2009 stands as the last reasoned decision. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir.2000).

# IV.

## *DISCUSSION*

Petitioner's lone contention is that the trial court violated his rights to a fair trial and unbiased jury by granting the prosecution's *Batson/Wheeler* motion, and thereby denying a defense peremptory challenge and allowing the challenged juror to remain seated. Pet. at 5(A)-(C). This claim does not merit habeas relief.

### A. *Petitioner's Claim Is Barred By Teague and Is Not Cognizable*

In essence, petitioner's claim is that he was wrongly denied a peremptory challenge, and that this amounts to a constitutional violation. Respondent contends that petitioner's claim is barred by the anti-retroactivity doctrine set forth in *Teague*, 489 U.S. 288, 109 S.Ct. 1060. Answer at 10–14. The court agrees.

■ Under *Teague*, a new rule of constitutional law cannot be applied retroactively on federal collateral review to upset a state conviction or sentence unless: (1) the new rule forbids criminal punishment of "primary, private individual conduct"; or (2) is a "watershed rule[ ] of criminal procedure." *Caspari v. Bohlen*, 510 U.S. 383, 389, 396, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994) (internal quotation marks and citations omitted). The Supreme Court has made it clear that if the state argues "the defendant seeks the benefit of a new rule of constitutional law, the [federal habeas] court *must* apply *Teague* before considering the merits of the claim." *Id.* at 389, 114 S.Ct. 948 (citation omitted). This is true regardless of whether the case is governed by AEDPA. *Horn v. Banks*, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002).

■ The Ninth Circuit has held that, in order to assert a *Teague* claim, at a minimum: (1) "*Teague* should be identified as an issue (indeed the first issue)"; (2) "the new rule of constitutional law that falls within its proscription should be articulated"; (3) "the reasons why such a rule would not have been compelled by existing precedent should be explained with particular reference to the appropriate universe of precedent"; and (4) "an argument should be made why the rule contended for is not within one of *Teague's* exceptions." *Arredondo v. Ortiz*, 365 F.3d 778, 781–82 (9th Cir.2004). *Teague* applies where a habeas claim would require the announcement of a new rule. *See Saffle v. Parks*, 494 U.S. 484, 487–88, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) ("on collateral review, we must first determine whether the relief sought would create a new rule under ... *Teague* "); *see also Stringer v. Black*, 503 U.S. 222, 228, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) ("If ... the decision [relied upon] did not announce a new rule, it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." (citation omitted)). In other words, under *Teague* "[t]he 'rule' need not already have been announced by the United States Supreme Court." *Tirado v. Warden*, 576 F.Supp.2d 1104, 1110 (C.D.Cal.2008).

■ The court agrees with respondent's analysis that granting relief on this claim would require the court to announce a new rule of constitutional law, i.e., that a "defendant has a federal constitutional right to peremptory challenges so that the erroneous denial of a peremptory challenge results in a violation of federal due process, or that the erroneous denial of a state-created right to a peremptory challenge is a federal due process violation." Answer at 12. The United States Supreme Court has expressly held to the contrary—that there is no federal constitutional right to peremptory challenges.

*Rivera v. Illinois,* 556 U.S. 148, 157, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009) ("there is no freestanding constitutional right to peremptory challenges"); *United States v. Martinez–Salazar,* 528 U.S. 304, 311, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) ("peremptory challenges are not of federal constitutional dimension"); *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988) (same). Thus, the court finds that petitioner seeks the benefit of a new, never-before-announced rule regarding the constitutional right to peremptory challenges.

■ Such a new rule would not fit within either of the two narrow exceptions to the *Teague* non-retroactivity rule. First, the proposed new rule is obviously not one that places a class of private conduct beyond the power of the State to proscribe, or addresses a substantive categorical guarantee accorded by the Constitution, or de-criminalizes a class of conduct. *See Teague,* 489 U.S. at 311, 109 S.Ct. 1060. Second, the proposed new rule does not fit within the exception for "watershed rules of criminal procedure, implicating the fundamental fairness and accuracy of the criminal proceeding." *Saffle,* 494 U.S. at 495, 110 S.Ct. 1257 (internal quotation marks and citation omitted). To qualify for this second exception, a new rule must meet two conditions: (1) it must relate to the accuracy of the conviction; and (2) it must also "alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding." *Sawyer v. Smith,* 497 U.S. 227, 242, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) (internal quotation marks and citation omitted); *see also Butler v. McKellar,* 494 U.S. 407, 416, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990) (this exception is meant to apply to those procedures without which the accuracy of a conviction would be seriously diminished).

■ Moreover, even if not *Teague-*barred, the trial court's alleged erroneous denial of petitioner's peremptory challenge is not cognizable on federal habeas corpus review. In conducting habeas review, a federal court is limited to deciding whether a conviction violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("federal habeas corpus relief does not lie for errors of state law" (internal quotation marks and citations omitted)). As discussed above, there "is no freestanding constitutional right to peremptory challenges." *Rivera,* 556 U.S. at 157, 129 S.Ct. 1446. "Because peremptory challenges are within the States' province to grant or withhold, the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution." *Id.* at 158, 129 S.Ct. 1446.

Accordingly, because the relief petitioner seeks would create a "new rule" that would not be retroactive to petitioner's conviction, and neither exception applies, this claim is barred by *Teague.* In addition, federal habeas corpus relief is not available on the ground petitioner claims. Consequently, the Petition should be denied.

**B.** *Petitioner's Claim Also Fails on the Merits*

To the extent petitioner's claim might be construed as alleging the deprivation of his right to an impartial jury, it arguably would be cognizable and not *Teague* barred. But petitioner has shown no such deprivation.

■ The Sixth Amendment guarantees every criminal defendant a right to an impartial jury. *See Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Cook v. LaMarque,* 593 F.3d 810, 826 (9th Cir.2010). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitu-

tional right to an impartial jury." *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir.1979) (internal quotation marks omitted). The standard for whether a prospective juror should be excused for cause "is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (internal quotation marks and footnote omitted).

█ Petitioner has failed, in his Petition, to identify the biased juror or allege any facts to support his claim that the challenged juror was biased against him.[3] *See generally* Pet. at 5(A)-(C). Assuming petitioner is relying on the allegations in his state papers, petitioner's peremptory challenge was directed towards Juror No. 17. *See, e.g.*, Lodg. No. 3 at 15–17. But despite claiming now that Juror No. 17 was biased against him, petitioner never sought to challenge this juror for cause, nor did he assert that she was challengeable for cause in his state papers. *See* Reporter's Transcript ("RT") at 134–38; Lodg. No. 3 at 15–17; Lodg. No. 5 at 2–5; Lodg. No. 7 at 10–13.

The proffered reasons for excusing Juror No. 17 included the following: (1) Juror No. 17 appeared to defense counsel to be staring at her and exhibiting questionable body language; (2) Juror No. 17's assurances that she could be fair to the defendants on trial was inconsistent with her statements that she found these hate crimes disgusting; (3) Juror No. 17 had a strong reaction to the hate crime allegation and did not like the "N" word; and (4) Juror No. 17 had heard or read about the case. Lodg. No. 3 at 15–17. None of these proffered reasons, even if established, show Juror No. 17 was impartial or

biased against petitioner. "[B]ecause no member of the jury as finally composed[, including Juror No. 17,] was removable for cause," petitioner's "Sixth Amendment right to an impartial jury [and] his Fourteenth Amendment right to due process" were not violated. *See Rivera*, 556 U.S. at 158, 129 S.Ct. 1446 (citation omitted).

█ Moreover, the trial court found no factual basis, other than race, for petitioner's peremptory challenge to Juror No. 17. *See* RT at 136–37. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht v. Brown*, 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (citations omitted); *see also Skilling v. United States*, — U.S. —, 130 S.Ct. 2896, 2918, 177 L.Ed.2d 619 (2010) ("Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." (citation omitted)).

As the California Court of Appeal explained, the trial court's finding was supported by substantial evidence. Lodg. No. 6 at 18. For instance, although Juror No. 17 was one of the six jurors—Juror Nos. 6, 11, 12, 13, 14, and 17—who indicated that she had read or heard something about the case, the other five jurors were excused for reasons other than prior knowledge. *See* Lodg. No. 6 at 18–19 (Juror No. 6 was excused by the prosecution in a peremptory challenge; Juror No 11 was excused for

---

**3.** *See also James v. Borg*, 24 F.3d 20, 26 (9th Cir.1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." (citation omitted)).

her insistence that she could not be fair and that, as an African–American, she abhorred the "N" word; Juror No. 12 was excused because he was bothered by the charges and had read a lot and recently viewed television programs about the Neo-Nazi group being "antiracist"; Juror No. 13 was "stunned" by the charges, and said she worried about future retaliation against jurors by skinheads or Neo–Nazis; Juror No. 14 was excused for cause by the defense for his prior confrontation with skinheads and his questionable ability to be fair and objective). The California Court of Appeal also found, contrary to petitioner's contention, that Juror No. 17's response to the questions about the charges showed remarkable fairness. Juror No. 17 stated that the circumstances of the crime were "disgusting, but people have a right to their thoughts. But when they take those thoughts to a physical, that's why we have the court system and that's why we're here." RT at 77–78. The court agrees with the Court of Appeal's finding that "[r]ather than being an inconsistency, as [petitioner] alleged, this attitude bespeaks nothing so much as tolerance and an open mind." Lodg. No. 6 at 19.

In short, the record does not reflect any facts suggesting petitioner was denied his right to an impartial jury. At a minimum, the California Court of Appeal's rejection of any claimed error based on the denial of petitioner's peremptory challenge to Juror No. 17 was not an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, petitioner is not entitled to federal habeas relief on this claim.

## V.

### *RECOMMENDATION*

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this

Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

## JUDGMENT

Pursuant to the Order Accepting Findings and Recommendation of United States Magistrate Judge,

IT IS HEREBY ADJUDGED that the Petition is denied and this action is dismissed with prejudice.